CLAYTON RAHMIG, APPELLEE, V. MOSLEY MACHINERY COMPANY,
INC., APPELLANT.

412 N.W.2d 56

Filed September 11, 1987.    No. 85-529.

424

Francis L. Winner of Winner, Nichols, Douglas and Kelly, for appellant.

Robert P. Chaloupka of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, P.C., and Michael J. Javoronok of Holtorf, Kovarik, Nuttleman, Ellison, Mathis & Javoronok, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

Mosley Machinery Company, Inc., appeals the judgment entered on the verdict for Clayton Rahmig in a personal injury action based on a products liability claim for damages caused by a guillotine metal scrap shear manufactured by Mosley. We affirm.

## THE MONSTER

In 1979, Mosley manufactured a 500-ton guillotine scrap shear for use in the scrap metal business, marketed the shear with the trade name "Monster," and delivered one such shear to Rahmig's employer, Scottsbluff Pipe & Supply, Inc. The Monster was "capable of sizing and shearing two car frames simultaneously" and could "crush car blocks . . . or break engine blocks." The Monster had several parts and points important to Rahmig's claim: a loading deck; ram feed; squeeze box, or compactor; shear head, containing a shear cylinder and blades for cutting the compacted scrap metal; shear point, where the blades came together; discharge chute, as a conduit for metal sheared by the Monster; and a shaker table, where sheared metal, having moved from the Monster, came to rest

before removal by a crane. The Monster was operated from a control tower above the shear head.

Scrap metal, having been placed on the Monster's loading deck, was compacted (squeeze box) and then pushed (ram feed) into an opening at the shear point in the Monster's cutting chamber, where a 30-inch blade, located at the end of a 2-ton pivoting blade-arm, was pushed downward by a piston in the hydraulic shear cylinder. The movable blade, or shear, made contact with a stationary blade at the shear point, cutting the compacted scrap metal in an action similar to a scissors or guillotine. After metal had been sheared by the two blades, the sheared metal dropped into a slightly descending discharge chute or funnel located adjacent to the bottom, or stationary, blade. When the movable blade is at the shear point, the blade-arm is in a nearly horizontal plane, reducing the size of the cutting chamber to a height of 3 feet, which corresponds with the height of the discharge chute. As metal was cut, any previously sheared metal in the discharge chute was forced through and out the chute onto the shaker table for removal by a crane. The piston then raised the blade-arm to repeat the cycle. The Monster was not self-cleaning, that is, it contained no mechanical apparatus for expulsion or extraction of sheared metal. Any change in the type of metal being processed through the Monster required that previously sheared metal remaining in the discharge chute be removed manually from the chute before a different metal was inserted into the shearing process of the Monster.

## MECHANICS OF THE MONSTER AND ACCIDENT

The owner's manual for the Monster did not contain any recommended procedure for removing sheared metal from the area at the shear point or discharge chute. The manual, however, did provide a two-step procedure for changing the Monster's blades, namely, remove or "clean out" all metal in the discharge chute and, after raising the movable blade, use a block, such as a 4-inch by 4-inch oak block, between the raised blade and the floor of the discharge chute to prevent downward movement of the movable blade. Such procedure required someone to enter the chute, fix the block, and remove "blade bolts from inside the discharge box."

According to Henry Buhr, Rahmig's foreman at the scrap yard, there were no tools available for cleaning out the cut scrap

iron—"all we had was our hands." For some time before the accident, Buhr and other employees at the scrap yard had observed that the Monster's upper, or movable, blade would "stay up" if the machine were left running with its controls in the "up" position, which maintained hydraulic pressure in the shear cylinder and kept the blade-arm elevated. Without hydraulic pressure, the blade-arm would slowly descend and eventually come to rest at the shear point. Throughout past operation of the Monster at the scrap yard, the upper, or movable, blade had never unexpectedly descended. Sometime before the accident, Buhr noticed the Monster's main cylinder in the shear head was leaking oil and had "blown" some O-rings, apparently some type of gasket on the shear cylinder. One of Rahmig's fellow employees, Lee Navorette, described the usual situation in manually removing the sheared metal from the cutting chamber and discharge chute as "cramped and really oily . . . you had no place to put your hands," with no way to maintain balance within the chute except by placing one's hand on the "bottom part of the blade," that is, on the stationary, or lower, blade in the cutting chamber.

In August 1980, Rahmig, 21 years of age, had been operating the Monster to shear cast iron when Buhr decided to change from cast iron to steel as the metal being processed by the Monster. While the Monster was left running, with its controls locked in the "up" position, Rahmig descended from the control tower to help Buhr in removing sheared metal from the discharge chute. With the Monster's controls locked in the "up" position, Rahmig as well as his coemployees understood that the machine was "safe" and that the blade-arm would not descend.

Buhr and Rahmig stood beside the Monster, near the end of its discharge chute, and manually removed most of the sheared metal from the discharge chute. When sufficient metal had been removed to permit someone's entry into the chute, Buhr went to a nearby crane to load scrap metal. Rahmig crawled inside the Monster's discharge chute, where he crouched and started "kicking the iron out" with his boot. Pieces of sheared metal weighed between 25 and 50 pounds. To steady himself in such cramped quarters, Rahmig put his left hand on the

stationary blade in the cutting chamber and resumed cleaning metal from the chute. Without any forewarning, the upper blade suddenly descended, traumatically amputating three of Rahmig's four fingers on his left hand and so crushing a fourth finger that Rahmig had to "finish tearing . . . off" that finger to extricate himself from the blades. Rahmig climbed from the Monster and went to Henry Buhr, to whom he yelled that "I had cut my fingers off." Buhr drove Rahmig to the hospital.

## PLEADINGS

In his petition, Rahmig alleged that the Monster was a defective product manufactured by Mosley and asserted that the Monster was "unsafely designed" without safeguard against unexpected descent by the movable blade, making the Monster "unreasonably dangerous." Rahmig further alleged that the defects in the Monster "could have been easily and economically remedied by devices within the state of art of design of machines of similar types." Also, Rahmig asserted that Mosley was negligent in designing the Monster and, with reference to the sudden and unexpected descent of the Monster's upper blade, in "failing to adequately warn . . . foreseeable users, of dangers inherent in the design and use of the product, and not readily apparent to foreseeable users of the product." Rahmig, therefore, sought damages from Mosley on account of its strict liability (design defect) and negligence (defective design and failure to warn) regarding manufacture of the Monster.

In its amended answer, which, for the most part, was a general denial, Mosley denied liability and raised the affirmative defenses of contributory negligence and assumption of risk. Mosley then specifically alleged that there were no defects in the Monster's design, which conformed with the "state of the art" existing at the time of manufacture.

## PRETRIAL MOTION

At a pretrial hearing on Mosley's motion in limine to preclude certain evidence, the court asked Mosley's lawyer whether Mosley "is going to make feasibility an issue in this case?" Mosley's lawyer responded: "No, we're not." Mosley then objected to Rahmig's prospective presentation of evidence about Mosley's alterations on the Monster after Rahmig's

accident. The prospective evidence was two photographs (exhibits 56 and 57), which depicted a lockpin safety device installed in Mosley's shear machines sometime after Rahmig's accident, and exhibit 16, an intracompany memorandum, dated March 27, 1981, which directed that warning signs must be placed on any Monster shipped after the date of the memorandum. Mosley contended that the prospective evidence related to subsequent remedial measures for the Monster.

Directing the court's attention to *Nerud v. Haybuster Mfg.*, 215 Neb. 604, 340 N.W.2d 369 (1983), one of Rahmig's lawyers told the court: "We are offering [lockpin evidence] to show state of the art . . . that the state of the art would have required something like [the lockpin]." Still referring to *Nerud*, another of Rahmig's lawyers called the court's attention to the burden of proof placed on a plaintiff in a products liability case based on negligent design: "In the proper application of a risk versus utility analysis to a negligent design case, one of the factors which must be weighed is the feasibility of eliminating the risk and the existence of practicable alternative designs," *id.* at 612-13, 340 N.W.2d at 375, and a case based on strict liability (design defect): "[A] plaintiff, in order to prove that a particular product is defective in its design, must show that there was some practicable way in which the product could have been made safer," *id.* at 614, 340 N.W.2d at 375.

After the preceding excerpts from *Nerud*, Rahmig's counsel continued:

> And since that is a *new element of proof*, the Supreme Court has said that *must be shown*, then we have to show feasibility, not just to rebut the defenses, but also through the front door of showing feasibility . . . technologically and economically feasible design as part of our case in chief.

(Emphasis supplied.) The court took Mosley's motion under advisement and overruled that motion on the morning of trial, when Mosley's lawyer then renewed the objection reflected in the motion in limine. During trial, Mosley objected when exhibits 56, 57, and 16 were offered and received into evidence, on the basis that those exhibits related to Mosley's remedial measures taken after the Rahmig accident.

## BACKGROUND OF DESIGN DEFECT

As general background regarding the Monster's use at the scrap yard, Rahmig called witnesses who established that, throughout the Monster's operation at Scottsbluff Pipe & Supply, the movable blade had never unexpectedly descended during the course of manual cleaning. Because there was minimal clearance in the cutting chamber when the blade-arm was in a lowered position, it was standard procedure in the cleaning process to leave the Monster running, with its controls locked in the "up" position. Attempted use of wooden blocks resulted in crushed blocks or a situation where the blocks would "kick out" of their propped position as the blade-arm slowly descended. Mosley admitted that it did not provide any tool or instrument to remove sheared metal from the cutting chamber or discharge chute.

John McDonough, a service manager for Mosley but called as a Rahmig witness, testified that cleaning scrap metal from the Monster did not require anyone's entry into the discharge chute if a tool of some nature were utilized, although Mosley had already admitted it did not supply any cleaning tool with the Monster. McDonough acknowledged that no information was given to the Monster's purchasers regarding acquisition of such unspecified tool. McDonough admitted that the Monster was not self-cleaning, that is, once any metal was cut, "you're going to be left with whatever the last materials were that were processed in the discharge chute," and that cleaning the Monster necessitated manual removal of metal from the discharge chute. McDonough further acknowledged that when the Monster was running with its controls in the "up" position, one is justified in believing that the upper, or movable, blade will remain in its elevated position.

## RAHMIG'S EXPERT WITNESS

As an expert witness, Dr. Igor L. Paul testified for Rahmig. Dr. Paul, a professor of mechanical engineering at Massachusetts Institute of Technology, was a design consultant specializing in hydraulic systems such as that found in the Monster and other scrap shears. According to Dr. Paul, "foreseeability for a human to act, not necessarily to his best interest, is one of the prime reasons for providing safety

controls and safety devices on all kinds of machinery." Dr. Paul expressed:

[T]he very basic premise . . . is essentially that a machine or a product should not provide a hazard or risk of serious injury to the user or somebody around the machine under foreseeable use of the equipment, or the product. And, any machine that retains such a hazard should at the very least have warnings.

In view of the Monster's design, Dr. Paul felt that the "primary and largest hazard" of the machine was the "shear point of the cutting blade . . . so that both the cutting blade and the arm are extreme dangers to anybody who is either near the shear point or in the chamber of the shear." Dr. Paul observed that

it was clear to me and would have to be clear to any engineer, that in fact a person has to go inside the [Monster's] chamber . . . to . . . clean out the scrap . . . .

Scrap, cleaning out of scrap inside the chamber has to be performed both in terms of normal cleaning out, and prior to maintaining the cutting shear.

To prevent unexpected descent of the blade-arm, there should have been a "mechanical interlock" or "lockpin" on the Monster, but there was none. Dr. Paul described an interlock system and lockpin device as alternative safety measures which should have been incorporated into the Monster. An interlock is a hydraulic system in addition to and independent of a machine's basic hydraulic system, which mechanically locks the shear in a safe position, regardless of the "conditions of the controls" on the Monster. At a cost of $300 to $400, such interlock system would have prevented Rahmig's accident. As an alternative to the interlock system, a "safety pin," or lockpin, might have been used, that is, a metal bolt or shaft inserted from the outside and into an opening in the Monster's side, thereby obstructing the descent of the blade-arm. However, there was the possibility that forceful downward movement of the blade-arm might shear such "lockpin" inserted as a safety measure. As designed, the Monster's blade-arm was held up by a "dubious hydraulic circuit." Dr. Paul expressed an opinion that Mosley should have placed "an effective and distinct warning" on the Monster,

calling attention to the hazard resulting from the unexpected descent of the blade-arm. Dr. Paul expressed a further opinion that, from an "engineering standpoint," it was "certainly foreseeable" that removal of scrap from the Monster's cutting chamber would involve someone's presence inside the machine—likely someone who was unfamiliar with the "inner workings of a hydraulic system" and unaware of the "inherent danger" in the deficient hydraulic system in relation to the Monster's upper blade in an elevated position. From an engineer's standpoint in view of the Monster's design, it was foreseeable that a person's presence within the cutting chamber or discharge chute necessitated placing one's hand on the surface of the stationary blade, which was the "only surface" available for support to steady one inside the "cramped chamber."

## COURT'S ORAL ADMONITION TO JURY

In the course of his testimony, Dr. Paul referred to two photographs, which showed a lockpin safety device incorporated by Mosley, apparently in 1981 or 1982, into its scrap shears. At the conclusion of Dr. Paul's testimony, the court orally and generally informed the jury about Rahmig's two "theories of recovery"—negligence and strict liability—and the jury's permissible consideration of the photographs in reference to Rahmig's two causes of action. Mosley made no response to the court's oral admonition to the jury.

## ADVERSE WITNESS MAYNE

Rahmig also called John Mayne, assistant to the president of Mosley Machinery Co., who characterized Scottsbluff Pipe & Supply's employees as "foreseeable" users of the Monster and persons who reasonably could expect that the Monster's blade-arm would "stay up" as a result of the machine's controls in the "up" position. Mayne admitted that technology for a mechanical interlock system existed in 1979, when the Monster was manufactured, and that technology also existed in 1979 regarding a lockpin as a safety device on shear machines. Mayne acknowledged that unexpected descent of the Monster's upper blade was one of the hazards of the machine. According to Mayne, "blocking or using pins" was the standard in the

industry for preventing unexpected descent of the upper blade in machines such as the Monster, and a broom or some other instrument should have been used for cleaning or removal of sheared metal, rather than personal entry into the Monster. Mayne believed that anyone who had observed the Monster in operation would appreciate the danger of "putting any part of his body" into the opening at the shear point. Mayne testified that the Monster reflected the "state of the art" in shear machines, although the state of the art was set by Mosley and one other major manufacturer of shear machines. In answer to a question by Rahmig's lawyer, whether lockpins would have been an economically prohibitive feature of the Monster, which sold for $217,000, Mayne expressed his opinion that such safety device would have cost less than $1,000, an additional cost which would not deter potential buyers from purchasing the Monster. Rahmig's lawyer then questioned Mayne about two photographs (exhibits 56 and 57), which depicted a lockpin installed in a Mosley shear machine after Rahmig's accident. Over objection, those photographs were admitted into evidence.

Still as an adverse witness, Mayne acknowledged that a manufacturer "has got the duty to utilize all steps which are technically available and cost feasible to make his machine as safe as possible." Mayne testified that the Monster did comply with the "state of the art" as such existed in 1979. Further, Mayne agreed that Mosley, as a manufacturer, had a duty to recognize and follow the "warning standards" published by the American National Standards Institute, Inc. (ANSI), which standards represented the "state of the art" in 1979, when the Monster was manufactured. At page 7 of ANSI standard Z35.1-1972, the following appears: "Hazards should be eliminated wherever possible, but if they cannot be eliminated, the employee should be informed of the hazard by signs posted to give warning." However, when asked about warning signs on the Monster shipped to Scottsbluff Pipe & Supply, Mayne answered that he did not know what warning signs were on the Monster because "I did not see the machine when it was shipped." Rahmig's lawyer produced a memorandum from a Dennis Fortino, Mosley's vice president of marketing, to "three

individuals within the company." The memo was dated March 27, 1981, and directed: "Enclosed is a listing of safety signs to be used on the machines with drawings shown where they go. No machine should ship without these signs being on them." As directed by the memorandum, various warning signs were to be placed on Mosley's shears, such as in the area of a Monster's discharge chute, warning against climbing on the machine "With Power On," and "DANGER—Keep Away." No particular sign warned about the possibility of an unexpected descent by the upper, or movable, blade.

## CROSS-EXAMINATION OF RAHMIG'S WITNESS

During cross-examination of Lee Navorette, Mosley's counsel interrogated concerning Navorette's presence in the Monster's cutting chamber and whether Navorette had refrained from placing his hand on the stationary blade "because it was dangerous." Navorette responded, "I suppose so." On redirect examination, Navorette acknowledged that the stationary blade was "probably where you would put your hand," inasmuch as the blade afforded the only place to "lean" in the discharge chute. At the conclusion of redirect examination of Navorette, Mosley's counsel asked: "Could I ask a question?" The court responded: "No, you would probably get into a new area, this is proper redirect, and the last time everybody started asking too many questions. We'll just go to direct, cross and redirect. And, therefore, [Navorette] may step down." Mosley made no offer of proof or otherwise expressed any further question to be asked of Navorette.

## MOSLEY'S EXPERT

As part of its defense, Mosley called Bob Schliem, an expert witness. Schliem was a consultant engineer and accident reconstructionist regarding machine failure such as occurred with the Mosley Monster. Schliem testified that the Monster was not "designed defectively," and "shoring" (using blocks) was an acceptable precaution minimizing the hazard involved in the Monster's shearing function and cycle. Under the circumstances, Schliem believed it was "[v]ery dangerous" for Rahmig to put his hand on the Monster's lower blade. Concerning Dr. Paul's testimony, Schliem acknowledged that installation of an interlocking system as a safety device on a

shear machine had "certain merits," but "I would be leary about putting a device on without considerable direct feedback as to what that device was doing when it's supposed to be doing [its] thing." [?] Schliem expressed his doubt concerning the alternative safety devices suggested by Dr. Paul, namely, the interlocking system and lockpins. The use of a wooden block, according to Schliem, was a "reasonable accident prevention measure." Schliem felt that the responsibility for warning about potential dangers of the Monster rested primarily on the owner of the Monster rather than on the manufacturer, especially since any warning sign might be covered by paint applied by the manufacturer or the user of the machine.

## RAHMIG'S DAMAGES

At the time of the accident, Rahmig was earning $214 per week. After the accident and on account of his injury, Rahmig was unable to work for approximately 10 weeks, and incurred medical expenses of $2,300. An orthopedic surgeon testified that Rahmig had permanent impairment estimated at 24 percent of Rahmig's entire left hand, taking into account "pain and disability doing things" and including "problems in cold weather." Rahmig testified that he had occasional numbness in his left hand, with hypersensitivity during cold weather, thereby restricting any employment requiring outdoor work the year around. A former employer refused to hire Rahmig after the accident because Rahmig had difficulty in handling tools and working outside in cold weather. When Rahmig's hand bumped into anything, he experienced pain. Rahmig has displayed an inability to handle tools and grip objects. For example, on account of his poor or impaired grip, Rahmig dropped two fishing poles over the side of a boat.

Rahmig, with a high school education at the time of trial, had been active in athletics, but no longer participated in such activities because he continues to experience restricted dexterity with his left hand. Other recreational activities are more laborious as the result of Rahmig's poor grip. Rahmig has become severely depressed and remains self-conscious of his injury when he is around other people.

## JURY VERDICT

In its instruction on any damages which might be awarded on

Mosley's liability, the court informed the jury concerning various permissible elements of damages under the circumstances. The damages instruction did not mention that a fee for Rahmig's attorneys or tax consequences of an award were not proper considerations in determining the amount of damages. The jury returned a general verdict for $120,000.

### MOSLEY'S MOTION FOR NEW TRIAL

In its motion for a new trial, Mosley alleged jury misconduct and excessiveness of the verdict. Mosley offered affidavits from three jurors, stating that during deliberations a juror remarked that Rahmig would have to pay his attorneys a fee, as well as pay income tax on any award. Such remark influenced the jurors, who increased their award to Rahmig. The court sustained Rahmig's objection to the affidavits.

### ASSIGNMENTS OF ERROR

Mosley's first assignment of error may be summarized as expressed in its brief: "The theory of strict liability should not have been submitted to the jury, being not only barred by the plaintiff's assumption of the risk, but also not having been proven by a preponderance of the evidence. There was no submissible cause of action" regarding strict liability (design defect). Brief for Appellant at 21.

Mosley's other assignments of error are allegations that the trial court erred in (1) admitting exhibits 56 and 57 (photographs) and the March 27, 1981, memorandum reflecting postaccident matters; (2) denying Mosley a directed verdict, because Rahmig assumed the risk and his contributory negligence, as a matter of law, barred recovery; (3) giving oral instructions to the jury on Rahmig's "theories of recovery"; (4) prohibiting Mosley's recross-examination of Lee Navorette; (5) precluding use of affidavits reciting the jury's consideration of an attorney fee for Rahmig's counsel and the possible effect of income taxation regarding an award to Rahmig; and (6) denying a new trial on account of an excessive verdict.

### STRICT LIABILITY FOR DEFECTIVE DESIGN

As expressed in *Nerud v. Haybuster Mfg.*, 215 Neb. 604, 610-11, 340 N.W.2d 369, 373-74 (1983):

> In products liability litigation the notion of a defective product embraces two separate concepts. The first,

commonly labeled a manufacturing defect, is one in which the product differs from the specifications and plan of the manufacturer. . . .

The second concept of a defective product is one in which the product meets the specifications of the manufacturer but the product nonetheless poses an unreasonable risk of danger. This condition is generally characterized as a design defect. . . .

In products liability, there is a significant distinction between a manufacturer's liability as the result of negligent manufacture and liability for the manufactured product on account of strict liability in tort. In a cause of action based on negligence, the question involves the manufacturer's conduct, that is, whether the manufacturer's conduct was reasonable in view of the foreseeable risk of injury, whereas in a cause of action based on strict liability in tort, the question involves the quality of the manufactured product, that is, whether the product was unreasonably dangerous. See, *Dart v. Wiebe Mfg., Inc.*, 147 Ariz. 242, 709 P.2d 876 (1985); *Nesselrode v. Executive Beechcraft, Inc.*, 707 S.W.2d 371 (Mo. 1986).

In *Kohler v. Ford Motor Co.*, 187 Neb. 428, 436, 191 N.W.2d 601, 606 (1971), this court, recognizing a manufacturer's strict liability in tort, stated: "We hold that a manufacturer is strictly liable in tort when an article he placed in the market, knowing that it is to be used without inspection for defects, proves to have a defect which causes an injury to a human being rightfully using that product."

Also, in *Kohler*, this court adopted the user-contemplation test contained in Restatement (Second) of Torts § 402 A (1965) and, for a recovery based on strict liability in tort, approved the following instruction:

"To recover against the defendant, the plaintiff must prove by a preponderance of the evidence: 1. The defendant placed the [product] in question on the market for use, and the defendant knew, or in the exercise of reasonable care should have known, that the [product] would be used without inspection for defects . . . ; 2. The [product] was in a defective condition at the time it was placed on the market and left the defendant's possession;

3. The plaintiff was unaware of the claimed defect; 4. The claimed defect was the proximate cause or a proximately contributing cause of any injury to the plaintiff occurring while the [product] was being used in the way and for the general purpose for which it was designed and intended; 5. The defect, if it existed, made the [product] unreasonably dangerous and unsafe for its intended use; 6. The plaintiff sustained damages as the direct and proximate result of the claimed defect . . . ."

187 Neb. at 436, 191 N.W.2d at 607.

After *Kohler v. Ford Motor Co., supra,* this court decided *Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979), which involved causes of action for negligence and strict liability regarding a manufacturer's "defectively designed" automobile bumper. After reaffirming the user-contemplation test (the Restatement, *supra*) adopted in *Kohler,* the *Hancock* court referred to the elements of strict liability enunciated in *Kohler, supra,* and stated: "[A] plaintiff in a strict tort liability case is not required to plead and prove he was unaware of the defect." (Emphasis omitted.) 204 Neb. at 486, 283 N.W.2d at 38. Further, in *Hancock,* and referring to a "strict liability case," this court also commented on "reasonable and economical alternatives" in relation to a claim based on strict liability for defective design of a product:

The question therefore is not whether anyone else was doing more, although that may be considered, but whether the evidence disclosed that anything more could reasonably and economically be done. [Citations omitted.] Plaintiff tendered evidence that there were alternatives which could be used and which, if used, would have prevented the enhanced injury. There was evidence that Paccar was using some of the alternatives itself and that both the material and the knowledge to design a safer alternative existed. That evidence included the use of a shorter bumper, a breakaway bumper, or a stronger bumper, all of which could have been designed in 1969. The jury was not required to accept any of those suggestions. Nevertheless, those were questions of fact which the jury had to resolve.

204 Neb. at 480, 283 N.W.2d at 35.

Four years after *Hancock v. Paccar, Inc., supra*, this court decided *Nerud v. Haybuster Mfg.*, 215 Neb. 604, 340 N.W.2d 369 (1983), which involved a claim for products liability as the result of a design defect. Nerud alleged two causes of action—one based on negligent design and the other based on strict liability—concerning a haystacking machine. In *Nerud* the court noted a "paucity of precedent" on the question whether, in a negligent design case, a plaintiff must demonstrate how the defectively designed product could have been made safer, but suggested that "such a requirement [was] hinted at in *Hancock v. Paccar, Inc., [supra].*" 215 Neb. at 612, 340 N.W.2d at 374. Regarding strict liability (design defect), the *Nerud* court then concluded:

> Restatement (Second) of Torts § 402A at 347-48 (1965) in relevant part provides: "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property . . . ."
>
> This court has defined the term "unreasonably dangerous" to mean that the product has a propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer who purchases it, with the ordinary knowledge common to the foreseeable class of users as to its characteristics. *Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979).
>
> We have not, however, had an opportunity to define the term "defective condition." . . . Our review of the cases has led us to the conclusion that a plaintiff, in order to prove that a particular product is defective in its design, must show that there was some practicable way in which the product could have been made safer. . . . As such, Nerud has failed to show that the haystackers in question were defective. Absent such a showing, his recovery under a strict liability theory cannot be successful.

215 Neb. at 614-15, 340 N.W.2d at 375-76.

Therefore, when Rahmig's case was tried, to recover on a claim of strict liability in tort for a defectively designed product,

a plaintiff was required to prove by a preponderance of evidence: (1) The defendant placed the product on the market for use and knew, or in the exercise of reasonable care should have known, that the product would be used without inspection for defects; (2) the product was in a defective condition when it was placed on the market and left the defendant's possession; (3) the defect was the proximate or a proximately contributing cause of plaintiff's injury sustained while the product was being used in the way and for the general purpose for which it was designed and intended; (4) the defect, if existent, rendered the product unreasonably dangerous and unsafe for its intended use; (5) some practicable way or feasible alternative to make the product safer; and (6) plaintiff's damages were a direct and proximate result of the alleged defect. See, *Kohler v. Ford Motor Co.*, 187 Neb. 428, 191 N.W.2d 601 (1971); *Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979); *Nerud v. Haybuster Mfg., supra.*

In a products liability action, the plaintiff has the burden to prove that the alleged defect existed when the product left the manufacturer. See *Shaffer v. Honeywell, Inc.*, 249 N.W.2d 251 (S.D. 1976). Whether a product is in a defective condition unreasonably dangerous to its user is, generally, a question of fact. *Thiele v. Faygo Beverage, Inc.*, 489 N.E.2d 562 (Ind. App. 1986).

The user-contemplation test embodied in Restatement (Second) of Torts § 402 A (1965) has been criticized by an increasing number of courts and commentators.

As expressed in Prosser and Keeton on the Law of Torts, *Products Liability* § 99 (5th ed. 1984), at least three reasons exist to show the general inadequacy of the user-contemplation test in determining whether a design makes a product dangerous:

(1) Under this test, a victim could never recover for harm suffered as a result of a design hazard that was open or obvious or one with respect to which the purchaser was adequately informed. So, the test can result in finding products to be not defective that could easily have been designed safer without great expense or effect on the benefits or functions to be served by the product;

(2) This test can result in the identification of products as being defectively dangerous that are clearly not, as when a new drug is a great boon to humanity but a few are victimized by a side effect or adverse reaction that was an unknowable risk;

(3) The meaning is ambiguous and the test is very difficult of application to discrete problems.

*Id.* at 698-99.

To respond to the inadequacies of the user-contemplation test for strict liability in tort, a different test developed, namely, the risk-utility test, that is, a product is defective as designed only if the magnitude of the risk or danger outweighs the utility of the product, when various factors are considered. See, *Ortho Pharmaceutical Corp. v. Heath*, 722 P.2d 410 (Colo. 1986); *O'Brien v. Muskin Corp.*, 94 N.J. 169, 463 A.2d 298 (1983); *Rix v. General Motors Corp.*, ____ Mont. ____, 723 P.2d 195 (1986). See, further, Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L.J. 825 (1973) (confusing terminology employed in the user-contemplation test; factors to be considered in the risk-utility test); Keeton, *The Meaning of Defect in Products Liability Law—A Review of Basic Principles*, 45 Mo. L. Rev. 579 (1980) (inadequacies of user-contemplation test); Uniform Product Liability Act § 104(B) (factors concerning an unreasonably unsafe design). In *Barker v. Lull Engineering Co.*, 20 Cal. 3d 413, 573 P.2d 443, 143 Cal. Rptr. 225 (1978), the Supreme Court of California adopted alternative tests for a manufacturer's strict liability in tort for a product's defective design, that is, the user-contemplation test or, if the plaintiff demonstrates that the product's design proximately caused injury, the defendant has the burden of proof to establish that the benefits of the challenged design outweigh the risk of danger inherent in such design.

Regarding products liability cases, Nebraska has yet to adopt the risk-utility test for strict liability in tort. Neither Rahmig nor Mosley suggests that such risk-utility test should be adopted to impose strict liability on a manufacturer of a defectively designed product. Whether Nebraska should or will adopt the risk-utility test for strict liability in tort is a matter for the future

in an appropriate case brought to this court. We mention the risk-utility test only to indicate the evolving law of products liability and to place in perspective Nebraska's present law concerning a manufacturer's strict liability in tort for a design defect.

## STANDARD OF REVIEW: SUFFICIENCY OF EVIDENCE FOR VERDICT

In considering whether evidence in a civil case is sufficient to sustain findings necessary for a verdict, the Supreme Court does not reweigh evidence, but considers the verdict in a light most favorable to the successful party and resolves evidential conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. See *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986). In reviewing sufficiency of evidence to sustain a verdict, the Supreme Court does not resolve conflicts of evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a jury, which are within a jury's province for disposition. A verdict in a civil case must be sustained if the evidence, viewed and construed most favorably to the prevailing party, is sufficient to support that verdict. See, *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*, 219 Neb. 303, 363 N.W.2d 155 (1985); *Armstrong v. Hartford Life Ins. Co.*, 219 Neb. 128, 361 N.W.2d 511 (1985). Cf. *State v. Brown*, 225 Neb. 418, 405 N.W.2d 600 (1987) (Supreme Court's review of a conviction by verdict).

## FACTUAL BASIS FOR VERDICT

Without repetitious reference to the facts already set forth in this opinion, the evidence is sufficient to support the jury's findings adverse to Mosley on the issue of strict liability for a design defect.

As a result of the Monster's design, it was foreseeable by Mosley that its product would be used by people such as Rahmig and that the cleaning procedure for the Monster would require personal presence of Rahmig in the Monster's cutting chamber or discharge chute. The risk from one's entry into the Monster's cutting chamber or discharge chute is beyond reasonable question or dispute in view of the Monster's dangerous condition or hazard—the sudden and unexpected

descent of the upper blade. Based on the Monster's history of operation at the scrap yard, workmen were justified in their reliance that the blade-arm of the Monster, with power on, would not unexpectedly descend—a fact admitted by Mosley. The Monster's design demanded that one who had entered the area of the shear point or discharge chute would seek some way to retain balance and, therefore, reach for some place on the Monster for support. It was further foreseeable, from an engineer's point of view, that a worker, in an effort to attain balance, would place a hand on the Monster's mechanical mandible, there to be injured by the unexpectedly descending blade. Dr. Paul's testimony graphically demonstrated practicable ways or feasible alternatives in which the Monster could have been made safer. As admitted by Mosley, the technology for those alternative safety systems was available when Mosley manufactured the Monster in 1979. Under the circumstances, the expense involved in incorporating those alternative safety devices was virtually nominal and posed no threat to the Monster's marketability. A case of strict liability in tort for design defect has been clearly established by Rahmig.

## STATE OF THE ART

Concerning products liability actions, Neb. Rev. Stat. § 25-21,182 (Reissue 1985) states:

In any product liability action based upon negligent or defective design, testing, or labeling, proof establishing that such design, testing, or labeling was in conformity with the generally recognized and prevailing state of the art in the industry at the time the specific product involved in the action was first sold to any person not engaged in the business of selling such product shall be a defense. State of the art as used in this section shall be defined as the best technology reasonably available at the time.

## NEBRASKA EVIDENCE RULE 407: SUBSEQUENT REMEDIAL MEASURES

Mosley contends that exhibits 56 and 57, depicting the lockpin device incorporated into Mosley's scrap shears, and exhibit 16, the memorandum regarding placement of warning signs on Mosley's scrap shears, were evidence of subsequent remedial measures inadmissible under Nebraska Evid. R. 407

(Neb. Rev. Stat. § 27-407 (Reissue 1985)), which provides:

When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment. Negligence or culpable conduct, as used in this rule, shall include, but not be limited to, the manufacture or sale of a defective product.

Before adoption of the Nebraska Evidence Rules, prohibition against evidence concerning postaccident repairs or safety precautions was expressed in *Pribbeno v. Chicago, B. & Q. R. Co.*, 81 Neb. 657, 116 N.W. 494 (1908): "Evidence of subsequent repairs made or precautions taken after an accident or the infliction of an injury is not admissible to prove antecedent negligence." (Syllabus of the court.) "The testimony would naturally impel the jurors to believe the [defendant] had ascertained its fault and was endeavoring to repair its dereliction, hence without question it had admitted its negligence." *Id*. at 659, 116 N.W. at 495. See, also, *Lindley v. Wabash R. Co.*, 120 Neb. 195, 231 N.W. 812 (1930).

Regarding Fed. R. Evid. 407, the federal counterpart to Neb. Evid. R. 407, the advisory committee noted:

The conduct is not in fact an admission, since the conduct is equally consistent with injury by mere accident or through contributory negligence. . . . The other, and more impressive, ground for exclusion rests on a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety.

"The encouragement of remedial measures . . . is the principal reason for the rule excluding evidence that such measures were taken." McCormick on Evidence § 275 at 817 (E. Cleary 3d ed. 1984).

According to Weinstein, the more generally accepted ground for exclusion under Rule 407 "is the policy of encouraging people to take safety precautions." 2 J. Weinstein & M. Berger,

Weinstein's Evidence ¶ 407[02] at 407-11 (1986). See, also, 2 J. Wigmore, Evidence in Trials at Common Law § 283 (J. Chadbourn rev. 1979).

The reason for Fed. R. Evid. 407, expressed by McCormick, and the policy consideration for Fed. R. Evid. 407, noted by Weinstein, are equally applicable to Neb. Evid. R. 407.

Whereas the Nebraska Evidence Rules, generally, are inclusionary and favor admission of relevant evidence rather than exclusion of evidence with probative value, Neb. Evid. R. 407 excludes from admissible evidence certain matters which occur after a particular event in question, where negligence or culpable conduct is sought to be proved in connection with such event. Cf. *Young v. Illinois Cent. Gulf R. Co.*, 618 F.2d 332, 337 (5th Cir. 1980) (Federal Rules of Evidence " 'favor the admission of evidence rather than its exclusion if it has any probative value at all' ").

In a products liability case based on negligence and the duty to warn:

> A manufacturer or other seller is subject to liability for failing either to warn or adequately to warn about a risk or hazard inherent in the way a product is designed that is related to the intended uses as well as the reasonably foreseeable uses that may be made of the products it sells.

Prosser and Keeton on the Law of Torts, *Products Liability* § 96 at 685 (5th ed. 1984).

> [A] manufacturer's duty to produce a safe product, with appropriate warnings and instructions when necessary, is no different from the responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others. . . .
>
>    . . . .
>
>    . . . [T]he duty of the manufacturer to warn of latent dangers inherent in its product goes beyond the precise use contemplated by the producer and extends to all those which are reasonably foreseeable.

*Moran v. Fabergé*, 273 Md. 538, 543, 545, 332 A.2d 11, 15-16 (1975). See, also, NJI 11.04 (duty/failure to warn regarding a defective product); Restatement (Second) of Torts § 388 (1965).

Whether "state of the art" is applicable regarding claimed

negligence in failure to warn about a defective product, we need not presently decide. See Neb. Rev. Stat. § 25-21,180 (Reissue 1985) (products liability actions in which "state of the art" may apply). An appeal is disposed on the basis of the theory presented by the pleadings on which the case was tried in the district court. *Foltz v. Northwestern Bell Tel. Co.*, 221 Neb. 201, 376 N.W.2d 301 (1985); *Holden v. Urban*, 224 Neb. 472, 398 N.W.2d 699 (1987). The record shows that Rahmig and Mosley conducted the trial of the negligence issue (failure to warn) with reference to "state of the art."

Mayne, as an adverse witness for Rahmig, testified that the Monster, when manufactured in 1979, conformed with the existing "state of the art," which included the ANSI standards concerning warning signs, namely, notice posted on a machine when a dangerous or hazardous defect existed in a machine. However, Mayne was unable to state that warning signs were on the Monster shipped to Scottsbluff Pipe & Supply. Without our deciding whether such intracompany memorandum was an admission by Mosley that all machines manufactured before March 27, 1981, were shipped without warning signs, including the Monster shipped to Scottsbluff Pipe & Supply, the memorandum tends to impeach Mayne and contradicts his testimony that the Monster in question conformed with the "state of the art"—a sign to warn an employee about the Monster's dangerous condition resulting from the design defect. Neb. Evid. R. 407 does not require exclusion of evidence concerning subsequent repairs, alterations, or precautions when such evidence is offered for the purpose of impeachment affecting credibility of the witness impeached. See, *Public Service Co. v. Bath Iron Works Corp.*, 773 F.2d 783 (7th Cir. 1985) (subsequent plans for product were admissible to contradict testimony that the product in question adequately conformed with prior successful design); *Runkle v. Burlington Northern*, 188 Mont. 286, 613 P.2d 982 (1980) (postaccident installation of an automatic flashing signal light contradicted testimony of railroad's expert who testified that a crossing was not extrahazardous); *Daggett v. Atchison, T. & S. F. Ry. Co.*, 48 Cal. 2d 655, 313 P.2d 557 (1957) (railroad's signal expert testified that a wigwag signal device, in use at the time of the

accident, was the safest type of automatic warning device; held, subsequent signal with flashing red lights was admissible for impeachment purposes). See, also, Annot., 74 A.L.R.3d 1001 (1976).

Consequently, the memorandum of March 27, 1981, was admissible under Neb. Evid. R. 407 to impeach Mayne and contradict his testimony that the Monster conformed with the state of the art.

In *Kurz v. Dinklage Feed Yard, Inc.*, 205 Neb. 125, 128, 286 N.W.2d 257, 260 (1979), and referring to Neb. Evid. R. 407, this court stated: "Feasibility . . . means more than capable of being done. It includes effectiveness and practicality." Feasibility may also relate to physical possibility, ultimate utility, and success of intended performance. See *Anderson v. Malloy*, 700 F.2d 1208 (8th Cir. 1983).

As noted earlier, regarding a cause of action against a manufacturer for strict liability in tort on account of a design defect: "[A] plaintiff, in order to prove that a particular product is defective in its design, must show that there was some practicable way in which the product could have been made safer." *Nerud v. Haybuster Mfg.*, 215 Neb. 604, 614, 340 N.W.2d 369, 375 (1983). As also expressed in *Nerud*: "Absent evidence that the risk could have been avoided by adopting a reasonable alternative design, [a plaintiff's] case in negligence based upon a defective design must fail." *Id.* at 613, 340 N.W.2d at 375. Therefore, Rahmig was required to prove a feasible substitute or practicable alternative as a safe design for the Monster in order to prevail on his strict liability claim against Mosley. Although the court in *Nerud* did not immediately and directly confront the evidential problem involving subsequent remedial measures and Neb. Evid. R. 407, such inevitable problem now confronts us in Rahmig's case. If Rahmig is required to prove a feasible alternative for a safer Monster, as required by *Nerud*, there is no better evidence of feasibility than the measures taken by Mosley after Rahmig's accident, namely, the lockpin device which Mosley found to be a practical solution for the hazardous problem with the sudden and unexpected descent of the Monster's upper blade. The exclusion sometimes warranted by Neb. Evid. R. 407 is, therefore,

subordinated to the type of proof required by *Nerud*, Nebraska's case law existing at the time of trial, lest Rahmig be prevented from proving requisite feasibility of a safer product and thereby risk an adverse directed verdict or forfeiture of a favorable verdict on account of such absence of proof. In view of *Nerud*, the same evidential requirement necessitates admissibility of subsequent remedial measures as proof for Rahmig's "theory" or cause of action based on Mosley's negligent design of the Monster.

Consequently, there was no error in admitting evidence regarding the Mosley matters which occurred after Rahmig's accident.

## STANDARD OF REVIEW: DIRECTED VERDICT

A party against whom a motion to dismiss is directed is entitled to have all such party's relevant evidence accepted or treated as true, every controverted fact as favorably resolved, and every beneficial inference reasonably deducible from the evidence. See, *Foltz v. Northwestern Bell Tel. Co.*, 221 Neb. 201, 376 N.W.2d 301 (1985); *Teegerstrom v. H. J. Jeffries Truck Line*, 216 Neb. 917, 346 N.W.2d 411 (1984). A court should not decide an issue as a matter of law unless the facts adduced to sustain an issue are such that reasonable minds can draw but one conclusion therefrom. *Foltz v. Northwestern Bell Tel. Co., supra*. Thus, in a jury trial, when evidence compels but one reasonable conclusion regarding an issue or question in the litigation, a court may properly direct a verdict on such issue or question.

## RAHMIG'S ASSUMPTION OF RISK

Mosley contends that, as a matter of law, Rahmig assumed the risk regarding the Monster's design defect and any hazard or danger consequent to such defect. Mosley also alludes to misuse of a product as a "corollary to assumption of risk." Brief for Appellant at 20.

Assumption of risk, under appropriate circumstances, may be an affirmative defense in an action brought for a manufacturer's strict liability in tort for a design defect. See *Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979). Ordinarily, the question of assumption of risk is for the jury, but, where the evidence is such that only one reasonable

conclusion is permissible, namely, a risk was assumed, a court, as a matter of law, may properly direct a verdict on such question. See, *Utsumi v. City of Grand Island*, 221 Neb. 783, 381 N.W.2d 102 (1986); *Garcia v. Howard*, 200 Neb. 57, 262 N.W.2d 190 (1978).

" ' "One who knows of a dangerous condition, appreciates its dangerous nature, and deliberately exposes himself to the danger assumes the risk of injury from it." ' " *Rodgers v. Chimney Rock P.P. Dist.*, 216 Neb. 666, 670, 345 N.W.2d 12, 15 (1984). See Prosser and Keeton on the Law of Torts, *Negligence: Defenses* § 68 at 487 (5th ed. 1984) (" 'Knowledge of the risk is the watchword of assumption of risk' ").

In contrast with contributory negligence (fault or breach of a duty to exercise such care as an ordinary prudent person would have exercised under the same or similar circumstances), assumption of risk " 'involves a choice made more or less deliberately and negatives liability without reference to the fact that the plaintiff may have acted with due care . . . .' " *Sandberg v. Hoogensen*, 201 Neb. 190, 197, 266 N.W.2d 745, 750 (1978), quoting *Landrum v. Roddy*, 143 Neb. 934, 12 N.W.2d 82 (1943). See *Utsumi v. City of Grand Island, supra.* In the law of products liability, misuse is use of a product in a way not reasonably foreseeable by the supplier or manufacturer, while assumption of risk is a user's willingness or consent to use a product which the user actually knows is defective and appreciates the danger resulting from such defect. See 3 T. Travers, American Law of Products Liability 3d § 42:17 (1987). See, also, *Heil Co. v. Grant*, 534 S.W.2d 916 (Tex. Civ. App. 1976). A user's knowledge about the general danger or hazard in using a product will not support the defense that the user knew the product's specific defect and dangerous condition resulting from such defect. *Heil Co. v. Grant, supra.* Thus, misuse is not an aspect of assumption of risk. See *Williams v. Brown Mfg. Co.*, 45 Ill. 2d 418, 261 N.E.2d 305 (1970). See, also, *Reese v. Chicago, Burlington & Quincy R.R. Co.*, 5 Ill. App. 3d 450, 283 N.E.2d 517 (1972).

There is no evidence that Rahmig knew about the Monster's latent design defect which caused the upper blade to descend suddenly and unexpectedly. Without knowledge that the

Monster's hydraulic system was deficient and, therefore, without his appreciation of the danger consequent to that condition in the machine, Rahmig could not assume the risk from the Monster's particular design defect. As pointed out by Dr. Paul, it was certainly foreseeable that an employee unfamiliar with the "inner workings of a hydraulic system" would enter the Monster to remove sheared metal. Given the absence of warning about the defect and the history of the Monster's operation at the scrap yard, as related by Rahmig and his coemployees, there was justified expectation that, with the Monster's power running and its controls in the "up" position to secure the blade-arm in an elevated position, it was safe to enter the Monster's cutting chamber or discharge chute to remove sheared metal. Under the circumstances, Mosley was not entitled to a directed verdict that Rahmig had assumed the risk of the Monster's design defect.

## RAHMIG'S CONTRIBUTORY NEGLIGENCE

Mosley claims that, as a matter of law, Rahmig was guilty of contributory negligence sufficient to bar recovery on his negligence claim. See Neb. Rev. Stat. § 25-21,185 (Reissue 1985) (contributory negligence; comparative negligence).

Initially, in a jury trial of a negligence action, the trial court must decide whether a plaintiff is guilty of negligence, and, if so, must then decide whether evidence is such that only one reasonable conclusion is permissible—the plaintiff's contributory negligence which, as a matter of law, bars recovery and authorizes a directed verdict for the defendant. See, *Utsumi v. City of Grand Island, supra; Garcia v. Howard, supra; Bartosh v. Schlautman*, 181 Neb. 130, 147 N.W.2d 492 (1966). If, as the result of such initial consideration of the evidence, the trial court determines that the jurors may reasonably draw different conclusions from the evidence, existence of the plaintiff's negligence or contributory negligence and comparative negligence are questions of fact for the jury. See *Poppe v. Petersen*, 221 Neb. 877, 381 N.W.2d 534 (1986).

However, contributory negligence, which consists merely of a plaintiff's failure to discover a defect or guard against the possibility of a defect's existence, is not a defense in an action

based on strict liability for a defective and unreasonably dangerous product. See, *Hancock v. Paccar, Inc.*, 204 Neb. 468, 283 N.W.2d 25 (1979); *Hawkins Constr. Co. v. Matthews Co., Inc.*, 190 Neb. 546, 209 N.W.2d 643 (1973).

"One who is capable of understanding and discretion but fails to exercise ordinary care and prudence to avoid obvious dangers is negligent or contributorily negligent." *Lynn v. Metropolitan Utilities Dist.*, 225 Neb. 121, 127, 403 N.W.2d 335, 339 (1987). "To determine whether conduct constitutes negligence, the invariable standard is reasonable care, although reasonable care is directly proportional to the danger inherent in conduct and may vary depending on the circumstances." *Id.* at 126, 403 N.W.2d at 339.

Whether some type of tool or instrument should have been used to clean or remove the sheared metal from the cutting chamber or discharge chute, rather than personal entry into the Monster, at the best for Mosley was a question of fact for the jury on the issue of Rahmig's reasonable care under the circumstances (no defect known to Rahmig, the Monster's history of general operation, and absence of warning about the defect). Evidence in this case did not compel only one conclusion—Rahmig's contributory negligence, as a matter of law, which barred recovery. Therefore, the jury was required to decide whether Rahmig's conduct was reasonable under the circumstances, a factual question answered adversely to Mosley.

## ORAL ADMONITION TO JURY

After the trial court's oral admonition to the jury regarding Rahmig's causes of action or theories for liability, Mosley did not object to or otherwise protest such admonition. We decline to consider alleged error regarding an issue never presented at trial and submitted for disposition by the trial court. See, *Norquay v. Union Pacific Railroad*, 225 Neb. 527, 407 N.W.2d 146 (1987); *Norris v. Iowa Beef Processors*, 224 Neb. 867, 402 N.W.2d 658 (1987); *Holden v. Urban*, 224 Neb. 472, 398 N.W.2d 699 (1987); *Haeffner v. State*, 220 Neb. 560, 371 N.W.2d 658 (1985).

## RECROSS-EXAMINATION OF LEE NAVORETTE

Mosley's counsel did not state the additional question which

he desired to ask Navorette, nor did counsel make an offer of proof indicating the line of questioning and information to be elicited in recross-examination of Navorette.

Neb. Evid. R. 611 (Neb. Rev. Stat. § 27-611 (Reissue 1985)) provides in part: "(1) The judge shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (a) make the interrogation and presentation effective for the ascertainment of the truth, (b) avoid needless consumption of time . . . ."

In the absence of an abuse of discretion, a trial court's ruling regarding the extent, scope, and course of cross-examination will be upheld on appeal. See, *Nixon v. Harkins*, 220 Neb. 286, 369 N.W.2d 625 (1985); *Chicago Lumber Co. v. Gibson*, 179 Neb. 461, 138 N.W.2d 832 (1965).

Generally, in the absence of an offer of proof, unless the substance of the evidence is apparent from the context in which the question is asked, no error may be predicated upon a court's ruling in excluding testimony. See Neb. Evid. R. 103(1)(b) (Neb. Rev. Stat. § 27-103(1)(b) (Reissue 1985)). See, also, *Birkel v. Hassebrook Farm Serv.*, 219 Neb. 286, 363 N.W.2d 148 (1985); *Morris v. Laaker*, 213 Neb. 868, 331 N.W.2d 807 (1983).

From the record presented, we are unable to fathom what question Mosley's counsel wished to ask or what area of inquiry would have been explored by any further questioning on recross-examination. The trial court committed no error in refusing to allow continuation of Mosley's recross-examination of Lee Navorette.

CONDUCT DURING JURY DELIBERATION

Mosley contends that the jury's apparent consideration of an attorney fee for Rahmig's counsel and possible tax consequences of an award to Rahmig necessitates setting aside the verdict.

Neb. Evid. R. 606(2) (Neb. Rev. Stat. § 27-606(2) (Reissue 1985)) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to

> assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes.

In *McDonald v. Pless*, 238 U.S. 264, 267-68, 35 S. Ct. 783, 59 L. Ed. 1300 (1915), the U.S. Supreme Court, rejecting allegations of a quotient verdict, refused to set aside the verdict and stated:

> If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict. But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding. Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation—to the destruction of all frankness and freedom of discussion and conference.

In reference to Fed. R. Evid. 606(b), which is the pattern for Neb. Evid. R. 606(2), McCormick states:

> First [Rule 606(b) does] not equate with, or govern, grounds for a new trial, but merely govern[s] the competency of jurors to testify concerning the jury process. Second, in addition to jurors' thought processes, discussions, motives, beliefs, and mistakes, [Rule 606(b)

excludes] irregular juror conduct in the jury room. Third, [Rule 606(b) does] not exclude juror testimony of extraneous prejudicial influences. Fourth, [Rule 606(b) does] not preclude testimony of others about their knowledge of jury misconduct.

McCormick on Evidence § 68 at 166-67 (E. Cleary 3d ed. 1984). Fed. R. Evid. 606(b) "does serve to protect in some measure the finality of verdicts, and it is this policy that has doubtless led to its survival." McCormick, *supra* at 166.

As expressed in 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 606[03] at 606-26 (1987):

Rule 606(b) seeks to reach an accomodation [sic] between policies designed to safeguard the institution of trial by jury and policies designed to insure a just result in the individual case. It does so by drawing the dividing line between inquiry into the thought processes of the jurors on the one hand, and inquiry into the existence of conditions or the occurrence of events calculated to exert an improper influence on the verdict, on the other.

In Neb. Evid. R. 606(2), the important phrase is "extraneous prejudicial information," and within that phrase the crucial word is *extraneous*, which means "existing or originating outside or beyond : external in origin : coming from the outside ... brought in, introduced, or added from an external source or point of origin." Webster's Third New International Dictionary, Unabridged 807 (1981).

In *Klein v. Wilson*, 167 Neb. 779, 94 N.W.2d 672 (1959), which was a negligence action regarding an automobile-truck accident, two jurors conducted experiments to ascertain the stopping distance of a vehicle and, during jury deliberations, informed the other jurors about the results of the experiments. In *Klein*, this court concluded that "the making of statements of fact by jurors which are not in evidence is error and is to be condemned." *Id*. at 788, 94 N.W.2d at 678. See *In re Beverly Hills Fire Litigation*, 695 F.2d 207 (6th Cir. 1982) (in an action against a wiring manufacturer, a juror conducted an experiment of his home's wiring and communicated the results to other jurors, contradicting evidence at trial; held: the juror's experiment was extraneous prejudicial information).

An attempt by juror affidavits to impeach a plaintiff's verdict (wrongful death of a minor) was reviewed in *Selders v. Armentrout*, 192 Neb. 291, 220 N.W.2d 222 (1974), where, during deliberations, members of the jury discussed life insurance on their minor children. This court rejected such affidavits and stated:

> The general rule is that affidavits or other sworn statements of jurors will not be received to impeach or explain a verdict, to show on what grounds it was rendered, to show a mistake in it, to show the jurors misunderstood the charge of the court, or to show they mistook the law or the result of the finding because such matters inhere in the verdict.

*Id*. at 294, 220 N.W.2d at 224.

Affidavits by two jurors, alleging impermissible punitive damages and a quotient verdict, were brought to the court's attention in *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980 (5th Cir. 1983). Ruling that such affidavits could not be considered to impeach the verdict, the court observed: "[A] jury's verdict should not be open to searching the minds and motives of the jurors . . . ." 709 F.2d at 998 n.16.

Discretionary prejudgment interest was included in a jury's award of compensatory damages in *Michaels v. Michaels*, 767 F.2d 1185 (7th Cir. 1985), but the court, relying on *McDonald v. Pless*, 238 U.S. 264, 35 S. Ct. 783, 59 L. Ed. 1300 (1915), affirmed the trial court's rejection of a juror's affidavit as an attempt to impeach the verdict. See, also, *Martinez v. Food City, Inc.*, 658 F.2d 369 (5th Cir. 1981) (during jury deliberations, a juror stated that defendant-employer should be "taught a lesson" in a wage and hour dispute; held: a juror's possible prejudices or improper motives were not "extraneous influences" and could not be used to impeach the verdict).

From the foregoing cases, it becomes clear that Neb. Evid. R. 606(2) permits use of a juror's affidavit to establish that the jury considered prejudicial information emanating from a source other than evidence presented at trial. However, it is just as clear that Neb. Evid. R. 606(2) prohibits a juror's affidavit to impeach a verdict on the basis of jury motives, methods, misunderstanding, thought processes, or discussions during

deliberations, which enter into the verdict.

The affidavits offered by Mosley related to an expression of a general opinion held by some jurors, based on common experience or knowledge, and perhaps even mistaken belief. The affidavits did not reflect "extraneous prejudicial information" entering into the verdict. The court properly excluded the jurors' affidavits offered to impeach the verdict for Rahmig.

## EXCESSIVE VERDICT

A verdict will not be set aside on appeal unless it is so clearly exorbitant as to indicate that it was the result of passion, prejudice, or mistake, or it is clear that the trier of fact disregarded the evidence or rules of law. See, *Duncza v. Gottschalk*, 218 Neb. 879, 359 N.W.2d 813 (1984); *Caradori v. Fitch*, 200 Neb. 186, 263 N.W.2d 649 (1978); *Johnson v. Schrepf*, 154 Neb. 317, 47 N.W.2d 853 (1951).

In view of all the evidence, we are unable to conclude that the verdict is excessive.

## *NERUD V. HAYBUSTER MFG.*, REVISITED

On account of its impact in the present case, we now reexamine *Nerud v. Haybuster Mfg.*, 215 Neb. 604, 340 N.W.2d 369 (1983).

One reason for adopting strict liability in tort regarding products liability claims is exoneration of a claimant from what is frequently an insurmountable burden of proof.

Through Judge Tobriner, the Supreme Court of California stated in *Barker v. Lull Engineering, Co.*, 20 Cal. 3d 413, 431, 573 P.2d 443, 455, 143 Cal. Rptr. 225, 237 (1978):

> [O]ne of the principal purposes behind the strict product liability doctrine is to relieve an injured plaintiff of many of the onerous evidentiary burdens inherent in a negligence cause of action. Because most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the "risk-benefit" standard—e.g., the feasibility and cost of alternative designs—are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer . . . .

Accord *Toliver v. General Motors Corp.*, 482 So. 2d 213 (Miss. 1985).

In his frequently-quoted article, *On the Nature of Strict Tort Liability for Products*, Professor John W. Wade observes:

> It is often difficult, or even impossible, to prove negligence on the part of the manufacturer or supplier. True, res ipsa loquitur often comes to the aid of the injured party. But it is normally regarded as a form of circumstantial evidence, and this means that there must be a logical inference of negligence which is sufficiently strong to let the case go to the jury. This is often not present, and strict liability eliminates the need of the proof.

44 Miss. L.J. 825, 826 (1973).

As previously pointed out, Nebraska still adheres to the user-contemplation test generally reflected in Restatement (Second) of Torts § 402 A (1965) and has not, as yet, adopted the risk-utility test, which among its factors includes feasibility. See Wade, *supra* at 837.

In *Nerud v. Haybuster Mfg., supra*, to formulate a requirement that "a plaintiff, in order to prove that a particular product is defective in its design, must show that there was some practicable way in which the product could have been made safer," 215 Neb. at 614, 340 N.W.2d at 375, the court relied heavily on *Wilson v. Piper Aircraft Corporation*, 282 Or. 61, 577 P.2d 1322 (1978), a products liability case *based on strict liability* (design defect) rather than negligent design. As acknowledged in *Wilson v. Piper Aircraft Corporation, supra*, Oregon had adopted the risk-utility test for a manufacturer's strict liability in tort. Wilson claimed that Piper had incorporated a defectively designed carburetor as a component in its aircraft, namely, a carburetor not using fuel injection to prevent or protect against carburetor icing, and alleged an alternative safer design. In *Wilson*, the Supreme Court of Oregon stated:

> [T]he court should balance the utility of the risk against its magnitude in deciding whether to submit a design defect case to the jury. One of the factors to be weighed in making this determination is the manufacturer's ability to

eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility. In other words, the court is to determine, and to weigh in the balance, whether the proposed alternative design has been shown to be practicable. . . .

. . . .

. . . *It is not proper to submit such allegations* [feasible and safer design] to the jury unless the court is satisfied that there is evidence from which the jury could find the suggested alternatives are not only technically feasible but also practicable in terms of cost and the over-all design and operation of the product. It is part of the required proof that a design feature is a "defect" to present such evidence. . . .

. . . .

There is not, however, any evidence about what effect the substitution of a fuel injected engine in this airplane design would have had upon the airplane's cost, economy of operation, maintenance requirements, over-all performance, or safety in respects other than susceptibility to icing. . . .

. . . .

. . . [W]e hold that plaintiffs did not produce sufficient evidence that a reasonably prudent manufacturer who was aware of the risks of carburetor icing would not have designed this model of aircraft with a carbureted engine, or that substitution of a fuel injected engine was practicable.

(Emphasis supplied.) 282 Or. at 68-71, 577 P.2d at 1326-28.

However, in *Wilson, supra*, the Oregon Supreme Court made the further observation and statement:

As pointed out above, the court's task is to weigh the factors bearing on the utility and the magnitude of the risk and to determine whether, on balance, the case is a proper one for submission to the jury. In this case we focus on the practicability of a safer alternative design and hold that the evidence was insufficient to permit the trial judge to consider that factor. *Our holding should not be*

> *interpreted as a requirement that this factor must in all cases weigh in plaintiff's favor before the case can be submitted to the jury.* There might be cases in which the jury would be permitted to hold the defendant liable on account of a dangerous design feature even though no safer design was feasible (or there was no evidence of a safer practicable alternative). If, for example, the danger was relatively severe and the product had only limited utility, the court might properly conclude that the jury could find that a reasonable manufacturer would not have introduced such a product into the stream of commerce. We hold here only that, given the nature of the product and of the defects alleged, it was improper to submit the issue of a defect in the engine design to the jury in the absence of appropriate evidence that the safer alternative design was practicable.

(Emphasis supplied.) 282 Or. at 71 n.5, 577 P.2d at 1328 n.5.

Even the court in *Wilson* acknowledged that in some cases, for instance, where danger from a product is relatively severe and the product has limited utility, a jury may find the manufacturer liable, although no safer design was feasible. Again, we are reminded that Nebraska has adopted the user-contemplation test of the Restatement (Second) of Torts § 402 A (1965), while Oregon has adopted the risk-utility test, with its various factors.

After criticizing the user-contemplation test, the Supreme Court of New Jersey, in *O'Brien v. Muskin Corp.*, 94 N.J. 169, 463 A.2d 298 (1983), applied the risk-utility test, reviewed various aspects of a products liability claim based on strict liability for design defect, and stated:

> By implication, risk-utility analysis includes other factors such as the "state-of-the-art" at the time of the manufacture of the product. . . . The "state-of-the-art" refers to the existing level of technological expertise and scientific knowledge relevant to a particular industry at the time a product is designed. . . .
>
> State-of-the-art relates to both components of the risk-utility equation . . . . Although the focus is on the product, our attention is drawn to the reasonableness of

the manufacturer's conduct in placing the product on the market. . . . In that regard, the risk side of the equation may involve, among other factors, risks that the manufacturer knew or should have known would be posed by the product, as well as the adequacy of any warnings. The utility side generally will include an appraisal of the need for the product and available design alternatives. . . . As we proceed, as we must, on a case-by-case basis, risk-utility analysis provides the flexibility necessary for an appropriate adjustment of the interests of manufacturers, consumers, and the public.

. . . The ultimate burden of proving a defect is on the plaintiff, but the burden is on the defendant to prove that compliance with state-of-the-art, in conjunction with other relevant evidence, justifies placing a product on the market. Compliance with proof of state-of-the-art need not, as a matter of law, compel a judgment for a defendant. State-of-the-art evidence, together with other evidence relevant to risk-utility analysis, however, may support a judgment for a defendant. In brief, state-of-the-art evidence is relevant to, but not necessarily dispositive of, risk-utility analysis. That is, a product may embody the state-of-the-art and still fail to satisfy the risk-utility equation.

The assessment of the utility of a design involves the consideration of available alternatives. If no alternatives are available, recourse to a unique design is more defensible. The existence of a safer and equally efficacious design, however, diminishes the justification for using a challenged design.

. . . .

*. . . To establish sufficient proof to compel submission of the issue to the jury for appropriate fact-finding under risk-utility analysis, it [is] not necessary for [a] plaintiff to prove the existence of alternative, safer designs.*
(Emphasis supplied.) 94 N.J. at 182-85, 463 A.2d at 305-06.

Other courts have concluded that proof of a feasible substitute or an alternative safe design is not part of a plaintiff's indispensable burden in a products liability action based on

design defect. See, *Seward v. Griffin*, 116 Ill. App. 3d 749, 766, 452 N.E.2d 558, 571 (1983) ("evidence of alternative design feasibility is relevant and admissible in a design defect case, but it is not an essential element of such case"); *Mitchell v. Fruehauf Corp.*, 568 F.2d 1139, 1144 (5th Cir. 1978) ("specific proof of the economic and technical feasibility of alternative designs" is not required); *Siruta v. Hesston Corp.*, 232 Kan. 654, 667, 659 P.2d 799, 808 (1983) (a products liability plaintiff "may properly show the *feasibility* of a safer design"); *Toliver v. General Motors Corp.*, 482 So. 2d 213 (Miss. 1985) (in a design defect case, the plaintiff may introduce evidence of an alternate design to show feasibility).

A requirement that a plaintiff prove feasibility, as a part of the plaintiff's burden of proof in a case based on strict liability for design defect, weighs down the plaintiff with the onus to provide evidence of those matters which are usually within the knowledge of the manufacturer, and is restoration of the exact burden to be avoided by the doctrine of strict liability in tort for a product's design defect.

Of no small importance is § 25-21,182, which clearly and emphatically states that, if a product conforms with the "best technology reasonably available at the time," such condition or status "shall be a defense." Technology is characterized or defined as the "application of scientific knowledge to practical purposes in a particular field." Webster's Third New International Dictionary, Unabridged 2348 (1981). Noting the characterization or definition of "state of the art" contained in § 25-21,182, Professor Keeton has stated: " 'State of the art' is also frequently used to mean that which is feasible in light of the technology which existed at the time the product was designed. . . . This definition requires consideration of what was reasonably capable of being done technologically and economically to reduce the risk of hazard." Keeton, *The Meaning of Defect in Products Liability Law—A Review of Basic Principles*, 45 Mo. L. Rev. 579, 595 (1980).

To avoid nonsuit as the consequence of *Nerud v. Haybuster Mfg.*, 215 Neb. 604, 340 N.W.2d 369 (1983), a products liability plaintiff must prove feasibility or practicality of another safer design, although feasibility and practicality are components of

technology which may constitute a statutory defense to the plaintiff's claim. As the result of *Nerud*, the products liability plaintiff can succeed on a claim based on design defect if, and only if, such plaintiff presents the initial evidence concerning state of the art, a question which the Legislature has statutorily directed shall be raised by the defendant-manufacturer. Thus, the plaintiff must present evidence pertaining to a defense before the defendant evidentially presents such defense. We would assuredly find irony in a requirement that a plaintiff, seeking recovery on account of negligence, must present evidence to negative contributory negligence before the defendant's evidence properly injects such defense into the trial—or suffer nonsuit of the plaintiff's case. A similar irony exists as the result of the burden of proof imposed by *Nerud* on a products liability plaintiff who seeks to recover on account of a product's design defect.

Therefore, insofar as *Nerud v. Haybuster Mfg., supra* at 614, 340 N.W.2d at 375, requires that "a plaintiff, in order to prove that a particular product is defective in its design, must show that there was some practicable way in which the product could have been made safer," *Nerud v. Haybuster Mfg., supra,* is disapproved and overruled.

In further examination of *Nerud v. Haybuster Mfg.*, we note *Nerud's* additional language:

> In the proper application of a risk versus utility analysis to a negligent design case, one of the factors which must be weighed is the feasibility of eliminating the risk and the existence of practicable alternative designs. . . .
>
> . . . Absent evidence that the risk could have been avoided by adopting a reasonable alternative design, [a plaintiff's] case in negligence based upon a defective design must fail.

*Id*. at 612-13, 340 N.W.2d at 375.

As a result of *Nerud*, in products liability cases there has been a fifth element added to the otherwise standard four elements of negligence, namely, the additional essential element of a feasible substitute product free from defect or a practical and reasonable alternative but safer design.

We also observe that, after *Nerud*, this court decided *Hilt*

*Truck Line v. Pullman, Inc.*, 222 Neb. 65, 382 N.W.2d 310 (1986), where we reiterated that, in a products liability case based upon negligent design, "to establish a prima facie case in negligence, a plaintiff need only establish some evidence of duty, breach, causation, and damages." *Id.* at 69, 382 N.W.2d at 313.

In cases other than products liability based on negligence, a plaintiff need only prove the basic four elements in a negligence case, namely, duty, breach of duty, proximate causation, and damages. See, *Ames Bank v. Hahn*, 205 Neb. 353, 287 N.W.2d 687 (1980) (attorney's alleged negligence in drafting a deed); *Floridia v. Farlee*, 201 Neb. 39, 266 N.W.2d 204 (1978) (automobile accident); *Wilbur v. Schweitzer Excavating Co.*, 181 Neb. 317, 148 N.W.2d 192 (1967) (excavator's alleged negligence in striking a buried gasline).

At the present, therefore, we find there is a five-element requirement to establish negligence in a products liability claim for defective design, while simultaneously other claims based on negligence are governed by the long-established requirements—duty, breach of that duty, proximate causation, and damages. Injecting a new requirement into a negligent design case, namely, the plaintiff's proof of a reasonable alternative design to avoid a dangerous product, obliterates a well-defined demarcation between negligence and strict liability in tort for design defect. Also, in cases for negligent design, where a plaintiff is required to prove an alternative and safer design or other feasible substitute for a manufacturer's product, evidence of feasibility in the form of the manufacturer's postaccident remedial measures, alterations, or precautions will provide classic evidence to establish the manufacturer's liability. Requiring a plaintiff to prove feasibility or a practicable alternative but safer product in a negligent design case unnecessarily invites perilous and unfairly prejudicial evidence of postaccident matters excludable under Neb. Evid. R. 407. The reason and policy consideration for Neb. Evid. R. 407 would be frustrated, if not totally annihilated. Therefore, we must also disapprove and overrule *Nerud v. Haybuster Mfg.*, 215 Neb. 604, 340 N.W.2d 369 (1983), insofar as feasibility or reasonable alternative design

must be proved by a plaintiff to prevail on a cause of action for negligent design in a products liability case.

In this manner, Nebraska's products liability law is harmonized with our previous decisions based on the user-contemplation test of Restatement (Second) of Torts § 402 A (1965), so that products liability claims may be proved by evidence admissible in accordance with Neb. Evid. R. 407.

AFFIRMED.

KRIVOSHA, C.J., and BOSLAUGH, J., concur in the result.