Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/21/2023 01:06 AM CDT

State of Nebraska, appellee, v.
Keith L. Allen, appellant.
___ N.W.2d ___

Filed July 14, 2023.    No. S-22-169.

1. **Criminal Law: Convictions: Evidence: Appeal and Error.** When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

2. **Criminal Law: Motions for New Trial: Appeal and Error.** In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.

3. **Effectiveness of Counsel: Appeal and Error.** Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.

4. ____: ____. In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

5. **Self-Defense.** To successfully assert the claim of self-defense, one must have a reasonable and good faith belief in the necessity of using force.

6. **Homicide: Words and Phrases.** A sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control.

7. **Evidence.** In determining the sufficiency of the evidence, the court should not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence, as these matters are for the finder of fact.

8. **Criminal Law: Juror Misconduct: Proof.** A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial.

9. **Juror Misconduct: Proof.** When an allegation of jury misconduct is made and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred.

10. **Motions for New Trial: Evidence.** A court's obligation to conduct an evidentiary hearing upon a motion for new trial is satisfied where the judge provides the movant with an opportunity to present evidence at a hearing on the motion for new trial.

11. **Juror Misconduct.** The matter of whether jury misconduct occurred is largely a question of fact.

12. **Juror Misconduct: Trial.** If jury misconduct occurred, the trial court must determine whether it was prejudicial to the extent that the defendant was denied a fair trial.

13. ____: ____. The question whether prejudice resulted from jury misconduct must be resolved by the trial court's drawing, from an independent evaluation of all the circumstances of the case, of reasonable inferences as to the effect of the extraneous information on an average juror.

14. **Juror Misconduct: Evidence.** The subject matter of the complaining party's offer of proof at an evidentiary hearing on alleged jury misconduct is carefully circumscribed by statute.

15. **Verdicts: Rules of Evidence: Jurors: Testimony.** Neb. Rev. Stat. § 27-606(2) (Reissue 2016) generally provides that in connection with an inquiry into the validity of a verdict, a juror may not testify as to anything that occurred during deliberations or as to the effect anything had on the juror's decision.

16. **Verdicts: Rules of Evidence: Jurors.** Pursuant to Neb. Rev. Stat. § 27-606(2) (Reissue 2016), no evidence may be received concerning the effect of any statement upon a juror's mind, its influence upon the juror, or the mental processes of a juror.

17. **Verdicts: Rules of Evidence: Jurors: Affidavits.** Neb. Rev. Stat. § 27-606(2) (Reissue 2016) does not allow a juror's affidavit to impeach a verdict on the basis of jury motives, methods, misunderstanding, thought processes, or discussions during deliberations.

18. **Words and Phrases.** "Extraneous," in the phrase "extraneous prejudicial information," means existing or originating outside or beyond; external in origin; coming from the outside; or brought in, introduced, or added from an external source or point of origin.

19. **Jurors.** Internal matters include the general body of experiences that jurors are understood to bring with them to the jury room.

20. \_\_\_\_. A juror's possible prejudices or improper motives are not extraneous influences.

21. **Rules of Evidence: Jurors.** Whether an intradeliberational statement by a juror about pretrial personal knowledge is extraneous information within the meaning of Neb. Rev. Stat. § 27-606(2) (Reissue 2016) depends on whether it was directly related to the litigation at issue.

22. \_\_\_\_: \_\_\_\_. For purposes of Neb. Rev. Stat. § 27-606(2) (Reissue 2016), information directly relates to the litigation at issue only when it is relevant to the factual circumstances of the case.

23. **Rules of Evidence: Jurors: Pretrial Procedure.** Where a juror's intradeliberational statements do not relate directly to a factual question in the case, the proper time to have raised the issue of the potential impact of the juror's special knowledge was during voir dire.

24. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

25. \_\_\_\_: \_\_\_\_. To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

26. \_\_\_\_: \_\_\_\_. To show prejudice from counsel's deficient performance, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

27. **Evidence: Expert Witnesses: Testimony.** A forensic pathologist who did not perform the autopsy at issue may nevertheless provide expert testimony regarding the cause of death, and any lack of firsthand knowledge goes to the weight of the opinion rather than its admissibility.

28. **Rules of Evidence: Expert Witnesses: Hearsay.** Neb. Rev. Stat. § 27-703 (Reissue 2016) contemplates admission of an expert's opinion based on hearsay supplying facts or data for that opinion, rather than requiring firsthand knowledge as the only source of information for an expert's opinion.

29. **Expert Witnesses: Hearsay.** An expert may rely on hearsay facts or data that are reasonably relied on by experts in his or her field.

30. **Effectiveness of Counsel.** Counsel is not ineffective for failing to make an objection that has no merit.

Appeal from the District Court for Lincoln County: Richard A. Birch, Judge. Affirmed.

Charles D. Brewster, of Anderson, Klein, Brewster & Brandt, for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. INTRODUCTION

The defendant appeals from his conviction of first degree murder and use of a weapon to commit a felony. He argues the evidence was insufficient to support the jury's verdicts. Alternatively, the defendant argues he is entitled to a new trial based on juror misconduct during deliberations when jurors allegedly discussed the reputation of the victim's family and speculated it might be "bad for us" if they did not convict the defendant. He asserts the trial court erred by finding the averment of a juror about such intradeliberational statements inadmissible under the general prohibition of Neb. Rev. Stat. § 27-606(2) (Reissue 2016) against "juror . . . testi[mony] as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon . . . any . . . juror's mind or emotions as influencing [the juror] or concerning his [or her] mental processes in connection there-with." The defendant argues the juror's testimony fell under the exception for "extraneous prejudicial information."[1] Finally, having new counsel on appeal, the defendant argues trial counsel was ineffective by failing to call a key eyewitness to testify at trial and failing to object to the opinion, by a pathologist who did not perform the autopsy, as to the victim's cause of death. We affirm.

---

[1] § 27-606(2).

## II. BACKGROUND

Keith L. Allen was convicted by a jury of first degree murder and use of a weapon to commit a felony, in relation to the shooting death of Brett Torres on May 22, 2020, at approximately 2:30 p.m. The defense argued the shooting was in self-defense. Allen was sentenced to the mandatory statutory term of life imprisonment for first degree murder and to 20 to 30 years' incarceration for the use of a weapon conviction.

The evidence was not in dispute that Allen shot Torres from the window of the passenger side of Allen's sedan, using a Glock 21 semiautomatic pistol that Allen was carrying in a holster on his hip. That pistol being a semiautomatic weapon, each trigger press fires only one round, but the trigger can be pressed in rapid succession. Amanda Beall was the driver of the sedan.

Beall had a volatile "on again, off again" romantic relationship with Torres, and they were "off again" on May 22, 2020. Allen testified that while he and Beall had once been romantically involved, on May 22 they were only friends.

Allen had accompanied Beall earlier that morning when she dropped off a receipt in Torres' mailbox. The receipt was for items Torres had purchased for Beall and wished to return because Beall and he were no longer together. Beall and Allen were on their way to Allen's house when they passed Torres at an intersection. Torres was driving his sport utility vehicle (SUV). He had a passenger, Devan Hovden, in the passenger seat, and Torres' dog was in the back seat. When Torres saw Beall, he turned around and followed the sedan in an attempt to speak with Beall. There were differing reports as to the speed and nature of Torres' driving, but Beall was not driving fast. Beall, Allen, Torres, and Hovden were all in possession of cell phones.

Beall eventually stopped next to Allen's house in an alley that ran through the middle of a city block, near the exit of the alley to the adjoining city street. Torres, who had followed her down the alley, pulled up along the right-hand side

of the sedan. Torres' SUV was facing the same direction as the sedan and positioned in such a way that the front passenger window of the sedan was lined up with the driver's window of the SUV. The vehicles were approximately 2½ feet apart.

Words were exchanged, the nature of which was in dispute. As soon as Torres opened the SUV's driver's-side door, Allen began shooting. Nine shell casings were found at the scene, and nine retained projectiles were found in Torres' body. Most of Torres' injuries were to his left side.

Torres was unarmed, and there were no firearms found in his SUV. Minor dents and scuff marks were later found on the sedan that indicated the SUV's driver's-side door had made contact with the sedan's passenger side at some point before law enforcement arrived. Torres was found by law enforcement in the driver's seat of the SUV, slumped over the center console, with his door open and one foot on the SUV's floorboard.

### 1. Cause of Death

Dr. Erin Linde, a forensic pathologist, was called by the State to give her independent expert opinion on Torres' injuries and cause of death. Linde described forensic pathology as the subspecialty of pathology that uses medical legal autopsy in conjunction with death investigation, medical history, circumstances of death, and ancillary testing to determine cause of death. Linde explained she did not conduct the autopsy, which was conducted by Dr. Matthias Okoye. In reaching her independent conclusions regarding Torres' injuries and cause of death, Linde had reviewed Okoye's reports and autopsy photographs taken by his team, photographs taken by law enforcement of the scene and of Torres' injuries, investigative reports, medical records and imagery, and emergency medical technician reports.

The State offered exhibit 113, which consisted of autopsy photographs, as well as photographs of Torres' body, which had been taken by law enforcement. Defense counsel did

not object, and the exhibit was received. Linde describes her notations on those photographs and what she found significant therein. This included her observation of gunshot entrance and exit wounds depicted in the autopsy photographs and in the photographs taken by law enforcement.

When Linde was asked if she could explain which wounds were identified in Okoye's report as entrance wounds, defense counsel objected on the ground of hearsay. The court asked the State to lay more foundation.

Linde reiterated she had reviewed both the autopsy photographs and the law enforcement photographs taken at a hospital and had reached her own conclusions about how many entrance wounds Torres had. She described, without objection, how many entrance wounds Okoye had documented and opined that Okoye had missed one entrance wound, because he had missed three wounds on Torres' posterior. Linde acknowledged that Torres was very large and opined that these wounds were missed by "not fully viewing the posterior or back aspect of . . . Torres at the time of autopsy." Linde explained she was able to ascertain those three wounds from the hospital photographs taken by law enforcement. They were not photographed by Okoye or his team.

Without objection, Linde testified she had identified 19 defects that included 13 entrance wounds and 4 exit wounds. Nine projectiles had been found in Torres' body. She could not determine how many times Torres had been shot, since a single bullet can cause more than one entrance wound. She testified that the toxicology laboratory detected relatively low amounts of cocaine and methamphetamine in Torres' system. She could not determine when those substances had been ingested. Linde opined, without objection, that Torres' cause of death was multiple gunshot wounds of his torso and extremities.

Defense counsel objected, on the ground of hearsay, to the State's subsequent offer of Linde's written report, because it contained Okoye's comments and Okoye was not

available for cross-examination. Defense counsel also believed the lengthy report would distract the jury. After a discussion between counsel and the court, the State withdrew the offer.

## 2. Hovden

Hovden testified that the day of the shooting, he was visiting with Torres. Torres was upset about Beall and asked Hovden if he wanted to drive around rather than "sitting at the house." Hovden described that they were "[j]ust chilling," listening to music, talking, and smoking cigarettes together.

Hovden noticed that Torres appeared to be occasionally messaging someone with his phone, but Hovden did not know with whom or ascertain the nature of the communications. In the SUV, Hovden and Torres briefly sat at the corner of an intersection and Torres seemed to be "sending long texts." Hovden "could tell" Torres was "upset about something."

When they proceeded from the intersection, going straight, they passed Beall driving in the opposite direction with a male passenger whom Hovden later identified as Allen. Hovden testified that he had never seen nor heard of Allen before that day.

Torres exclaimed, "'That's [Beall]'" and turned the SUV around in a parking lot, backing up quickly enough that the tires "screeched." Torres then started following behind Beall's sedan, going approximately 15 miles per hour.

According to Hovden, Torres yelled out the SUV's window, "'Pull over. I want to talk to [Beall].'" Beall did not stop, and Torres followed behind her.

When Torres eventually pulled the SUV up alongside the sedan where Beall had stopped it at the front of the alley, Hovden heard Allen say "to get the fuck out of here and to keep going." According to Hovden, Torres responded, "'No. I want to talk to [Beall].'"

Torres then "threw [the SUV] in park" and started to exit. Hovden testified that Torres had his left foot out and his right foot on the SUV's running board when Allen began to shoot.

### 3. Beall Interview Statements

Beall did not testify at trial. Informal discussions in the record reflect that neither the prosecution nor the defense was able to secure her attendance at scheduled depositions and that although subpoenaed for trial, Beall was physically ill, was suffering from anxiety, and had not shown up. The prosecution and defense had agreed that in lieu of Beall's testifying at trial, Officer Justin Erickson would testify, without either party making hearsay objections, about Beall's statements made during a police interview a few days after the shooting. The court informed the jury that Beall was unavailable.

Erickson testified that Beall told him there had been some domestic violence in her relationship with Torres. On the morning of the day of the shooting, Allen had accompanied Beall to Torres' house, where she deposited a receipt in Torres' mailbox. Allen had been insistent on helping her, even though she wanted to do the errand by herself. Beall relayed that Torres was jealous of Allen and that she was afraid of a confrontation. Beall reported that Torres owned a 9-mm handgun.

Later that day, Beall had picked Allen up at work and was taking him back to his house when they encountered Torres. Beall said Torres was yelling something out the window of his SUV, but she could not hear what he was saying. Beall reported to Erickson that when Torres was following them into the alley, Allen had said, "'All I need is a clear shot.'"

Still, when Beall stopped in the alley, she trusted that Allen would handle the situation appropriately. Erickson testified that during the later interview, Beall was "an emotional roller-coaster" and "difficult to follow," such that trying to "tie things together and make somewhat of a timeline was very difficult." Erickson did not testify as to any statements by Beall concerning her observations in the moments immediately preceding the shooting.

### 4. Rosendo Duran

Rosendo Duran, a resident who lived nearby, was outside using her phone when she saw what was later identified as Torres' SUV following what was later identified as Allen's sedan. The vehicles traveled away from her view, but she eventually heard yelling. According to Duran, one male with a deep voice was yelling, "'Just give me my stuff,'" while a different male voice repeatedly yelled, "'Fight me like a man'" and "'Get out. Get out of the vehicle.'" The man with the deep voice eventually responded, "'If I get out of this vehicle, I'm going to . . . beat your ass.'" Duran then heard gunfire.

### 5. Messages

Numerous messages leading up to the shooting, sent between Beall and Allen and between Beall and Torres, were entered into evidence at trial.

### (a) Between Beall and Allen

In a message sent by Allen to Beall a month before the shooting, Allen said he had been looking for Beall and hoped she was not at Torres' place or with someone else "who's gonna get [her] back on meth." Allen then expressed his anger toward "those motherfuckers" and threatened to kill them: "I swear to God, I'll kill those motherfuckers. Go ahead and turn me in if [you] want. I already did. Called Ft. Leavenworth yesterday." In a voicemail sent from Allen to Beall around the same time, Allen said, "If you're with who I think you're with," then he was "going to start killing."

One week before the shooting, Allen messaged Beall, indicating a rift in their relationship: "All your stuff is here. I didn't throw anything away," and "Please talk." This was followed with another message: "Where do you want me to take your stuff? I'm finished. Can't believe you're doing this again. What did I do?" Later, Allen messaged Beall, "All your stuff from here is across the street in the corner of the parking lot. I can't do this anymore." In further messages between

Beall and Allen, Beall confirmed that she had retrieved her belongings from the parking lot. Subsequently, Allen shared with Beall, "I'm so sad and confused. I don't know what the hell happened."

### (b) Between Beall and Torres

An investigator described Beall and Torres as having exchanged "literally . . . hundreds of — of messages back and forth throughout all hours of the day." A day before the shooting, messages from Torres to Beall reflect that they were not getting along and that Torres wanted a receipt for items he had purchased for Beall so he could return them. Torres eventually became frustrated with Beall's being nonresponsive to his messages and messaged Beall, "Tell the bitch boy your [sic] with to fight me."

Approximately 15 minutes later, he messaged, "Hurry up or imma Come there! And he will get fucked up by 3 people." This was followed with several other messages, including: "Not fucking around," "Stop playing u fuckin piece of shit," "And my girl wanna fight you," "I'll show u how whores get pimped out," and "Just wait run cant hide everything iv said I meant it."

Beall eventually responded, "Tomorrow sorry" and "Quit threatening me then you'll get it."

By the early morning hours of May 22, 2020, the messages from Torres to Beall became more subdued. Around 8 a.m., Beall messaged Torres about a nightmare she had. Torres responded around 9:30 a.m., "I'd hug you if I could take nightmares away." Torres told Beall he missed her, "Ur the one 4 me," and "I love you." Although by approximately 10 a.m., Torres messaged, "I said that just to piss u off."

Beall messaged Torres around 10 a.m., "Do you know that you have 72 hours to report a shooting?" When Torres expressed confusion, Beall referred to "fucking that bitch up for fun."

Torres reiterated several times during their conversation that he needed the receipt, and starting at approximately 10:30 a.m., their conversation focused on this topic. Around noon, Beall messaged Torres that the receipt was in Torres' mailbox.

Torres shifted his focus to getting Beall to retrieve her belongings. He messaged Beall, "Grab ur cloths [sic]" and "Get ur shit outta here already." Torres became impatient with Beall, sending messages such as "[C]ome now n hurry up" and "I got shit to do fr." Torres wrote, "Jesus I'll just throw it outside ur moms w ha t in the actual fuck get ur shit!" When Beall asked Torres why he was not dropping her things off if he was so impatient, he responded, "I'm not digging threw ur shit."

Beall messaged, "Please can you wait[?]" But Torres continued to pressure Beall to hurry, explaining, "Got home girl moving in." Torres then started threatening to throw Beall's belongings away. Torres was shot approximately 10 minutes later.

### 6. Allen's Testimony

Allen testified in his own defense. He explained that he had been in a romantic relationship with Beall for a short time in 2020, after which they remained friends. Beall stayed over at Allen's house "[o]ff and on." Allen testified that several weeks before the shooting, he saw messages on Beall's phone that were threatening to Beall. He also understood the messages as being threatening toward him, although Allen admitted Torres never mentioned him by name. Allen said he also saw the message from Torres the day before the shooting stating, "Tell the bitch boy . . . to fight me."

According to Allen, when his sedan, driven by Beall, crossed paths with Torres' SUV, Torres yelled at Beall, "'Is that your boyfriend?'" When Torres subsequently followed Beall and Allen, he was yelling for them to pull over and shouting, "'Fight me like a man.'" Torres also reportedly yelled, "'You can't outrun me. I'll get you. I'll end you.'"

Allen testified that once Beall and he were stopped in the alley, he drew his pistol, held it out the sedan's window, and "waved it and looked in their direction," after which he heard Torres' SUV start to decelerate. Allen testified that he then yelled at Torres, "'Don't you fucking stop. Get the fuck out of here.'"

Allen testified that Torres responded, "'Oh, fuck you'" and opened his door a little bit. Allen again waved his pistol and asked, "'Don't you see this?'"

According to Allen, he shot Torres when Torres further threatened him and pushed open his SUV's driver's-side door, hitting the passenger door of Allen's sedan. Allen testified: "And then he — he leaned . . . down as if — as if he was reaching, and then his next words were, 'Fuck that shit, I'm kill [sic] both of you bitches,' and he pushed his door open. And when his door hit mine, that's when I fired."

Allen admitted he never saw Torres with a firearm. Still, Allen explained, based on the threatening messages he had previously seen, he "was a hundred percent convinced that there was three people in [Torres' SUV] armed and I was about to get shot to death." Apparently, Allen had mistaken Torres' dog for a third person.

Allen said that Beall had turned the ignition off and that he did not feel he had any means of escape. He did not feel safe from a firearm simply by keeping the sedan's doors locked and its windows up. He testified he did not think he could exit the sedan and outrun the danger, explaining he had health problems reducing his ability to walk or move. When asked if he had told Beall to drive away, Allen testified, "I made several suggestions. She just wouldn't — wouldn't respond."

### 7. Character Evidence of Torres

The defense presented testimony pertaining to Torres' reputation for violent and aggressive behavior. A witness described Torres as the first aggressor in an assault at a party in 2017 at Torres' house. An ex-girlfriend described various instances where Torres had physically abused her.

The defense also presented evidence of Torres' drug usage. A witness related that he and Torres used illicit drugs together and that the last time they did so was around 9 a.m. on the day Torres was killed. They "did a loader of meth," which the witness explained was methamphetamine through intravenous injection. They consumed approximately .25 grams each, which is "not really a huge amount, but . . . was enough for intoxification [sic]." This witness also testified that he had seen Torres be aggressive, elaborating that 2 weeks before the shooting, Torres had broken the windows of a vehicle of someone who owed him money.

### 8. Admonishment of Family Members

At one point during trial, while the jury was in the jury room, the court directed some comments to Torres' family members to ensure there were no outbursts that would require them to be removed. The court said:

> These are going to be — this is where it's going to get difficult for some of the family members. And I noticed this morning that some of the family members were becoming rather emotional, and it's going to get harder. And you're certainly entitled to be here, but we need to make sure that there aren't any outbursts, there [isn't] any overflowing of emotions. And I know that this is going to be very hard for some of you just from where we started to get and from what I saw this morning, and this, frankly, is primarily directed toward . . . Torres's family. You're welcome to be in here as long as — but if you think you're going to have difficulty controlling your emotions and dealing with what you're going to have to look at, I'd appreciate it if you'd leave now rather than us needing to remove you later, because this is not going to be easy.
>
> So what I want to do is give you a — I'm going to take about a five-minute break, give you a chance just to think about it, settle down, see if you think you can do

it. If you can, you're welcome to stay. If it's going to be difficult for you, I'd ask you to consider whether or not you want to stay or if you want to come back.

We can certainly have — when we get beyond the photographs, we can certainly figure out a way to let you know so you can come back.

After a short adjournment, trial resumed. Before the autopsy photographs were displayed for the jury, the court gave family members an opportunity to leave the courtroom, explaining, "[I]t's going to be hard. If anybody starts crying or sobbing, we'll probably have to have you removed at that point, so you need to be able to keep your emotions in check while we're going through this."

### 9. Instructions on Extraneous Information

Prior to deliberations, the jury was instructed to "rely solely upon the evidence in this trial and that general knowledge everyone has" and "disregard . . . personal knowledge of any other specific facts." The court instructed that the evidence from which the jury was to find the facts consisted of the testimony of witnesses and exhibits received in evidence. Among the things the court described as not evidence was "anything [jurors] have — may have seen or heard about this case outside the courtroom."

### 10. Juror Discussion of Torres Family Reputation

Following the verdicts and after the jury was discharged, trial counsel moved for a new trial on the ground of juror misconduct. The court granted defense counsel a continuance of sentencing for 2 months to investigate the matter. An evidentiary hearing was subsequently held on the motion.

### (a) Exhibit 301

At the evidentiary hearing, the court accepted into evidence an affidavit by defense counsel, exhibit 301, with the

caveat that it was for the "purpose of foundation as to the procedures [defense counsel] underwent in order to get the information that is contained in Exhibit 300." Furthermore, the court instructed, "To the extent it's hearsay, it's not received for the truth of the matter."

In exhibit 301, defense counsel described having reached out to the jurors after a nonjuror reported to him that she had spoken to one of the jurors after trial, who said three jurors were intimidated to change their not-guilty votes. Five jurors did not respond to defense counsel's inquiries. Six jurors indicated they had not witnessed anything improper during deliberations and had not heard any comments regarding the Torres family reputation.

Two jurors noted that three fellow jurors had originally felt the case was one of self-defense, but that those jurors changed their opinions after discussing the law and facts with other jurors. One juror indicated that during a break when there were only two or three jurors in the room, another juror mentioned the Torres family.

Jurors reported that there were no threats, coercion, or bullying during deliberations. One juror stated that early on in deliberations, the jurors had agreed they could not consider anything not brought up during trial.

## (b) Exhibit 300

The court sustained the State's objection, pursuant to § 27-606, to defense counsel's offer of exhibit 300, which consisted of the affidavit of one of the jurors who had been party to the conversation with fellow jurors about the reputation of the Torres family. In refusing to enter exhibit 300 into evidence, the court explained that the statements contained therein pertained to deliberations and not to extraneous matters.

Trial counsel asked that the exhibit be sealed in order to protect the identity of the juror, and the court sealed the exhibit. In exhibit 300, a juror averred that "[t]he reputation of the Torres family came up during deliberations." According

to the juror, "[e]veryone knew something about the Torres family" and "[its] reputation of being a mafia-type family was mentioned"; "it was stated that if this goes bad, meaning the outcome was not what the Torres family wanted, it may be bad for us (the jurors)."

The juror averred to having been, along with two other jurors, originally of the opinion that Allen acted in self-defense and eventually "the lone hold-out juror with this opinion." "The other jurors were not threatening or derogatory," but the averring juror felt "pressure to give up [that] honest opinion of not guilty," because the other jurors "wanted to . . . go back to their lives and get the case over."

### (c) Motion Overruled

No other evidence was offered by defense counsel in support of the motion for a new trial. Defense counsel did not request that the court have the jurors return to be examined. Because the jury had been discharged and the jurors were not called to testify at the hearing, the court did not question any of the jurors directly.

The court overruled the motion for new trial, stating that Allen had failed to meet his burden of proof. The court found that even if exhibit 300 would have been admissible, it would have been insufficient to support a new trial, because the only pressure to change the verdicts described in the affidavit was the pressure from the other jurors "to go home." The court elaborated that while the jurors said the Torres family reputation was discussed, the juror nowhere stated that anybody was influenced by that discussion.

## III. ASSIGNMENTS OF ERROR

Allen assigns that (1) the evidence adduced at trial was insufficient to sustain his convictions, because a rational trier of fact could not have concluded that Allen killed Torres purposely and with deliberate and premeditated malice and not in self-defense. Allen assigns that the trial court erred

with respect to alleged juror misconduct (2) by not granting his motion for new trial, (3) by not receiving his evidence at the hearing on the motion for new trial, (4) by ruling that jurors' statements during deliberations regarding the Torres family were not extraneous prejudicial evidence, (5) by finding that jurors' statements during deliberations regarding the Torres family were not sufficient to prove jury misconduct, (6) by finding that Allen did not meet his burden of proving jury misconduct through his evidence submitted to the court at the hearing on his motion for new trial, (7) by not conducting an investigation into Allen's claim of jury misconduct upon being informed of the alleged misconduct, (8) when jurors considered the potential revenge of Torres' family members if the jury returned verdicts of not guilty, and (9) when the jury failed to follow the court's instructions. Allen assigns that trial counsel was ineffective by (10) failing to call a key eyewitness to the incident in question and (11) failing to object to, and stipulating to, the admission of scientific evidence offered by the State in the form of testimony concerning Torres' autopsy and cause of death.

## IV. STANDARD OF REVIEW

[1] When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[2]

[2] In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed.[3]

---

[2] *State v. Cox, ante* p. 104, 989 N.W.2d 65 (2023).

[3] *State v. Trail*, 312 Neb. 843, 981 N.W.2d 269 (2022).

[3] Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law.[4]

[4] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[5]

## V. ANALYSIS

### 1. Sufficiency of Evidence

We first address Allen's assignment of error attacking the sufficiency of the evidence to sustain his convictions. According to Allen, a rational trier of fact could not have concluded that he killed Torres purposely and with deliberate and premediated malice, as opposed to in self-defense or upon a sudden quarrel. When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[6] Applying this standard, we hold the evidence was sufficient for the jury to find that Allen shot Torres purposely and with deliberate and premediated malice and not in self-defense or upon a sudden quarrel.

[5] We have repeatedly stated that to successfully assert the claim of self-defense, one must have a reasonable and good faith belief in the necessity of using force.[7] Neb. Rev. Stat. § 28-1409(1) (Reissue 2016) generally provides the

---

[4] *State v. Johnson, ante* p. 20, 988 N.W.2d 159 (2023).

[5] *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023).

[6] *State v. Cox, supra* note 2.

[7] *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009).

use of force upon or toward another person is justifiable only if the actor believes that such force is "immediately necessary for the purpose of protecting himself [or herself] against the use of unlawful force by such other person on the present occasion." Section 28-1409(4) states that the use of deadly force shall not be justifiable unless the actor believes that such force is necessary to protect himself or herself against death, serious bodily harm, kidnapping, or sexual intercourse compelled by force or threat. According to § 28-1409(4), nor is it justifiable if, among other things, the actor "provoked the use of force against himself [or herself] in the same encounter" or, subject to certain exceptions not applicable here, "knows that he [or she] can avoid the necessity of using such force with complete safety by retreating."

[6] A sudden quarrel is a legally recognized and sufficient provocation which causes a reasonable person to lose normal self-control.[8] It is not the provocation alone that reduces the grade of the crime, but, rather, the sudden happening or occurrence of the provocation so as to render the mind incapable of reflection and obscure the reason so that the elements necessary to constitute murder are absent.[9]

There was evidence in this case from which a rational jury could have concluded that Allen had talked about killing Torres before the shooting and, as Torres slowly followed his sedan down the alley, had exclaimed, "'All I need is a clear shot.'" A rational jury could have found that when Torres stopped alongside Allen, Allen repeatedly provoked Torres by yelling, "'Fight me like a man'" and "'Get out of the vehicle.'" A rational jury could have disbelieved Allen's testimony that he thought Torres had reached for a gun and that there were two other occupants of the SUV who were armed. Or, it could have found such beliefs unreasonable. Either way, a rational jury could have found that Allen was

---

[8] *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020).

[9] *Id.*

not in imminent danger of serious bodily harm while inside his sedan and that Allen could have called for help, regardless of any mobility issues he may have had.

[7] While Allen relies on his testimony as to a different version of events, in determining the sufficiency of the evidence, we do not resolve conflicts in the evidence, pass on the credibility of the witnesses, or reweigh the evidence, as these matters are for the finder of fact.[10] There was sufficient evidence to support the jury's finding that Allen, who shot Torres at least nine times before Torres had fully exited his SUV, killed Torres purposely and with deliberate and premediated malice.

## 2. Juror Misconduct

We next address Allen's assertions that juror misconduct warranted a new trial. We limit our consideration to those alleged errors that have been both specifically assigned and specifically argued in his initial brief.[11] Allen assigns and argues that the trial court erred by failing to receive exhibit 300 into evidence. He argues the juror's averment therein that there were discussions during deliberations regarding the Torres family's potentially seeking revenge was admissible under § 27-606(2) because it concerned extraneous information improperly brought to the jury's attention. He also assigns and argues that the trial court erred by not questioning the jurors when exhibit 300 tended to prove that serious misconduct had occurred. Pointing to the court's admonishments of the Torres family members in the courtroom and the alleged violation of the jurors' oaths to disregard personal knowledge, Allen generally concludes that further inquiry of the jurors would have shown he was prejudiced by the extraneous information.

---

[10] See *State v. Cox, supra* note 2.

[11] See, *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019); *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019).

Neb. Rev. Stat. § 25-1142(2) (Reissue 2016) provides, "The former verdict, report, or decision shall be vacated and a new trial granted on the application of the party aggrieved for any of the following causes affecting materially the substantial rights of such party: . . . (2) misconduct of the jury or prevailing party." "[M]isconduct of the jury," as the term is used in § 25-1142(2), does not necessarily mean a jury's bad faith or malicious motive, but means a jury's violation of, or departure from, an established rule or procedure for production of a valid verdict.[12]

[8-10] A criminal defendant claiming jury misconduct bears the burden of proving, by a preponderance of the evidence, (1) the existence of jury misconduct and (2) that such misconduct was prejudicial to the extent that the defendant was denied a fair trial.[13] We have held that when an allegation of jury misconduct is made and is supported by a showing which tends to prove that serious misconduct occurred, the trial court should conduct an evidentiary hearing to determine whether the alleged misconduct actually occurred.[14] The court's obligation to conduct an evidentiary hearing is satisfied where the judge provides the movant with an opportunity to present evidence at the hearing on the motion for new trial.[15]

[11-13] The matter of whether the misconduct occurred is largely a question of fact.[16] If jury misconduct occurred, the trial court must then determine whether it was prejudicial to the extent that the defendant was denied a fair trial.[17] The question whether prejudice resulted from jury

---

[12] *Loving v. Baker's Supermarkets*, 238 Neb. 727, 472 N.W.2d 695 (1991).

[13] *State v. Hairston*, 298 Neb. 251, 904 N.W.2d 1 (2017).

[14] *State v. Stricklin*, 290 Neb. 542, 861 N.W.2d 367 (2015).

[15] See, *State v. McDonald*, 230 Neb. 85, 430 N.W.2d 282 (1988); *Anis v. BryanLGH Health System*, 14 Neb. App. 372, 707 N.W.2d 60 (2005).

[16] *State v. Steinmark*, 201 Neb. 200, 266 N.W.2d 751 (1978).

[17] *State v. Stricklin, supra* note 14.

misconduct must be resolved by the trial court's drawing, from an independent evaluation of all the circumstances of the case, of reasonable inferences as to the effect of the extraneous information on an average juror.[18]

[14] However, the subject matter of the complaining party's offer of proof at an evidentiary hearing on alleged jury misconduct is carefully circumscribed by statute.[19] An evidentiary hearing with regard to allegations of jury misconduct does not extend to matters which are barred from inquiry under § 27-606(2).[20]

[15] Section 27-606(2) generally provides that in connection with an inquiry into the validity of a verdict, a juror may not testify as to anything that occurred during deliberations or as to the effect anything had on the juror's decision. Section 27-606(2) allows an exception to this rule for a juror to testify "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

Section 27-606(2) states in full:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his

---

[18] See *State v. Woodward*, 210 Neb. 740, 316 N.W.2d 759 (1982).

[19] See *State v. Owen*, 1 Neb. App. 1060, 510 N.W.2d 503 (1993).

[20] *State v. Cardeilhac*, 293 Neb. 200, 876 N.W.2d 876 (2016).

affidavit or evidence of any statement by him indicating an effect of this kind be received for these purposes.

[16,17] Pursuant to § 27-606(2), no evidence may be received concerning the effect of any statement upon a juror's mind, its influence upon the juror, or the mental processes of a juror. Section 27-606(2) does not allow a juror's affidavit to impeach a verdict on the basis of jury motives, methods, misunderstanding, thought processes, or discussions during deliberations.[21]

Section 27-606(2) is designed principally to protect the jury's deliberation process, including its votes.[22] Allowing the use of jurors' testimony to set aside their verdicts would result in jurors' being "'harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct.'"[23] As stated by the U.S. Supreme Court, this would transform what was intended to be a private deliberation into a constant subject of public investigation, thereby destroying ""all frankness and freedom of discussion and conference,""" and as further stated by the Court, while "[t]here is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior," "[i]t is not at all clear . . . that the jury system could survive such efforts to perfect it."[24]

The exceptions under § 27-606(2) for extraneous prejudicial information and outside influence are intended to strike a balance between ensuring a just result in an individual case and the rule's principal policy of "'safeguard[ing] the

---

[21] See *State v. Stricklin, supra* note 14.

[22] See *State v. Boppre*, 243 Neb. 908, 503 N.W.2d 526 (1993).

[23] *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 454, 412 N.W.2d 56, 76 (1987), quoting *McDonald v. Pless*, 238 U.S. 264, 35 S. Ct. 783, 59 L. Ed. 1300 (1915).

[24] *Tanner v. United States*, 483 U.S. 107, 120, 107 S. Ct. 2739, 97 L. Ed. 2d 90 (1987).

institution of trial by jury.'"[25] "Drawing the line between 'extraneous prejudicial information' and 'thought processes' that inhere in the verdict deliberations, has been a challenging assignment for the courts."[26] At issue in this case is whether intradeliberational statements by a juror sharing pretrial knowledge of the reputation of the Torres family and discussion about whether jurors would be in danger if they did not convict Allen were extraneous information for purposes of § 27-606(2).

[18-20] We have defined "extraneous," in the phrase "extraneous prejudicial information," as meaning "existing or originating outside or beyond: external in origin: coming from the outside . . . brought in, introduced, or added from an external source or point of origin."[27] Many cases conclude that an influence may be considered "outside" only if it does not originate within the jury.[28] This is in contrast to "'internal'" matters, which include the general body of experiences that jurors are understood to bring with them to the jury room.[29] We have specifically held that a juror's possible prejudices or improper motives are not extraneous influences.[30]

[21,22] We have held that whether an intradeliberational statement by a juror sharing pretrial personal knowledge is extraneous information within the meaning of § 27-606(2)

---

[25] See *Rahmig v. Mosley Machinery Co., supra* note 23, 226 Neb. at 455, 412 N.W.2d at 77, quoting 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 606[03] (1987).

[26] R. Collin Mangrum, Mangrum on Nebraska Evidence § 27-606 at 520 (2023).

[27] *State v. Hairston, supra* note 13, 298 Neb. at 258, 904 N.W.2d at 6 (internal quotation marks omitted).

[28] 27 Charles Alan Wright & Victor James Gold Federal Practice and Procedure § 6075 n.14 at 521 (2d ed. 2007), and cases cited therein.

[29] *Warger v. Shauers*, 574 U.S. 40, 51, 135 S. Ct. 521, 190 L. Ed. 2d 422 (2014).

[30] See *Rahmig v. Mosley Machinery Co., supra* note 23.

depends on whether it was "directly related to the litigation" at issue.[31] For purposes of § 27-606(2), information directly relates to the litigation at issue only when it is "relevant to the *factual circumstances of the case.*"[32]

We have long held that a juror who makes intradeliberational statements based on specific pretrial knowledge relevant to a factual dispute in the litigation acts as a witness in the case without being cross-examined[33] and that such statements are admissible to support claims of juror misconduct.[34] For example, in *State v. Steinmark*,[35] in a criminal proceeding involving the alleged unlawful delivery of illegal substances, a juror told fellow jurors during deliberations that the defendant had previously been convicted of the same offenses and that the bar where the defendant worked was known to be a place where illegal drugs could be purchased. We held that the statements were admissible as extraneous information.[36]

In contrast, in *Nichols v. Busse*,[37] we addressed, in an action for intentional infliction of emotional distress brought by the mother of a victim who died in a car accident, a juror's intradeliberational statements recounting a similar accident that killed her cousin. Also, this same juror stated during

---

[31] See *Malchow v. Doyle*, 275 Neb. 530, 539, 748 N.W.2d 28, 37 (2008). Accord, *Leavitt v. Magid*, 257 Neb. 440, 598 N.W.2d 722 (1999); *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993).

[32] *Leavitt v. Magid, supra* note 31, 257 Neb. at 449, 598 N.W.2d at 728 (emphasis supplied).

[33] See, *Ewing v. Hoffine*, 55 Neb. 131, 75 N.W. 537 (1898); *Wood River Bank v. Dodge*, 36 Neb. 708, 55 N.W. 234 (1893).

[34] See *State v. Steinmark, supra* note 16. See, also, *Leavitt v. Magid, supra* note 31; *Nichols v. Busse, supra* note 31.

[35] *State v. Steinmark, supra* note 16.

[36] Id. See, also, U.S. v. Swinton, 75 F.3d 374 (8th Cir. 1996); Taite v. State, 48 So. 3d 1 (Ala. Crim. App. 2009). See, also, generally, 58 A.L.R.2d 556 (1958).

[37] *Nichols v. Busse, supra* note 31.

deliberations that as an insurance worker, she had witnessed inflated insurance claims. Evidence had been adduced at trial that the accident victim's estate received a $100,000 wrongful death settlement, but the jury was told to disregard it. We held that the juror's statements were not extraneous information, because they were not directly related to the litigation as issue.

Likewise, in *Leavitt v. Magid*,[38] we held that the legal knowledge expressed by an attorney-juror who had allegedly intimidated other jurors into using a definition of proximate cause that conflicted with the jury instruction was not extraneous prejudicial information.[39] We acknowledged that the definition of proximate cause may relate generally to the legal issues presented for the jury to determine. We explained that, nevertheless, it was not specific to the "factual circumstances of the case."[40]

While we have not had occasion to specifically address intradeliberational statements sharing community knowledge of local inhabitants' reputations, at least one other court has explained that "community knowledge" is not external information.[41] The court in *Titus v. State*[42] reasoned that "generalized knowledge that is available to a significant portion of the community should not qualify for the exception both because it would make it impossible to hold trials in small communities and because such information is more likely to be tested by the jury itself."

Applying these principles, the court in *Titus* held, in a trial for rape in a community of approximately 750 people, that

---

[38] *Leavitt v. Magid, supra* note 31. See, also, *Malchow v. Doyle, supra* note 31.

[39] See, also, e.g., *State v. Van*, 268 Neb. 814, 688 N.W.2d 600 (2004).

[40] *Leavitt v. Magid, supra* note 31, 257 Neb. at 449, 598 N.W.2d at 728.

[41] See *Titus v. State*, 963 P.2d 258, 264 (Alaska 1998).

[42] *Id*. at 263.

jurors' discussion of their general knowledge of the defendant's drinking habit was not extraneous information. Neither was it extraneous information when the jurors speculated that the defendant had been drinking the night of the alleged rape because there had been a local carnival. This was in contrast to the jurors' alleged statements that they had observed or otherwise knew the defendant had actually been drinking on the night in question, which the court held was extraneous information.[43]

The court in *Titus* also held that because defense counsel did not challenge jurors or request a change of venue, despite the jurors' revealing during voir dire their general familiarity with the defendant, defense counsel had waived the defendant's right to impeach the jury verdict based on bias stemming from general familiarity. However, because none of the jurors revealed during voir dire knowledge of the defendant's actual conduct at the time of the alleged rape, the defendant did not waive his right to impeach the jury verdict based on the consideration of extra-record evidence.

[23] We have explained that where the juror's intradeliberational statements of preexisting knowledge do not relate directly to a factual question in the case, the proper time to have raised the issue of the potential impact of the juror's special knowledge was during voir dire.[44] We discussed in *Nichols* that an appellant waives a juror's use of specialized or general preexisting knowledge during deliberations by not making appropriate inquires or challenging the juror for cause before trial commenced.[45] This is consistent with the view of other jurisdictions that the exception for extraneous prejudicial information applies only to matters that could not have been discovered during voir dire through adequate

---

[43] See *Titus v. State, supra* note 41.

[44] See *Nichols v. Busse, supra* note 31.

[45] *Id.*

questioning, either because a juror's exposure to extra-record evidence occurred after voir dire or because the juror lied during that process.[46] It has been said, "'[O]ur system would grind to a halt if venirepersons could be left on the jury and then be criticized after the verdict for doing nothing more than what was imminently (sic) foreseeable.'"[47]

The shooting in the instant case took place, and the trial was held, in North Platte, Nebraska, a city of the first class having a population of more than 5,000 but fewer than 100,000 inhabitants.[48] It was foreseeable that members of the community where Allen and Torres lived might have knowledge of the reputation of the Torres family. There is no allegation that this knowledge was deliberately concealed during voir dire. The proper time to have raised the issue of the potential impact of the jurors' knowledge of the reputation of the Torres family was during voir dire.

More fundamentally, the reputation of Torres' surviving extended family was generalized knowledge available to a significant portion of the community that did not directly relate to the litigation. The reputation of the Torres family was not specific to the factual circumstances of the case. It was not relevant to whether Allen killed Torres with deliberate and premeditated malice.

And the jurors' speculation, based on this community knowledge, that they might suffer some harm from the Torres family if Allen were not convicted, is not information from an external source at all. Such speculation originated within the jurors from their general body of experiences, prejudices, or improper motives, which we have explained are not extraneous influences. This speculative fear is similar to

---

[46] 27 Wright & Gold, *supra* note 28.

[47] *People v. Newman*, 471 P.3d 1243, 1252 (Colo. App. 2020).

[48] See, Neb. Rev. Stat. § 17-101 (Reissue 2022); *Tryon v. City of North Platte*, 295 Neb. 706, 890 N.W.2d 784 (2017).

that presented in *U.S. v. Krall*.[49] The Eighth Circuit Court of Appeals held in *Krall* that a juror's fear the Internal Revenue Service might retaliate if the juror did not convict the defendant of filing false tax returns went to the juror's own mental process and subjective prejudices or improper motives and was not external information. Such speculative fear is distinct from evidence that an outside threat was actually brought to bear upon a juror.[50]

We find no merit to Allen's reliance on *Pena-Rodriguez v. Colorado*[51] as supporting the admissibility of exhibit 300. The Court in *Pena-Rodriguez* held:

> [W]here a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.[52]

The Court in *Pena-Rodriguez* set forth several reasons why racial bias should be treated differently from ordinary bias, including the fact that racial bias "implicates unique historical, constitutional, and institutional concerns" and is "a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice."[53] The Court in *Pena-Rodriguez* also pointed out that the safeguards of voir dire are not as effective in exposing racial bias and that in fact, questions during voir dire can exacerbate whatever prejudice might exist. The reputation of the Torres family and

---

[49] *U.S. v. Krall*, 835 F.2d 711 (8th Cir. 1987).

[50] See *Tanner v. United States, supra* note 24.

[51] *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 137 S. Ct. 855, 197 L. Ed. 2d 107 (2017).

[52] *Id*., 580 U.S. at 225.

[53] *Id*., 580 U.S. at 224.

speculation as to what its members might do in response to the jury's verdicts do not implicate the same concerns as racial animus against a defendant.

We hold that exhibit 300 did not contain extraneous information within the meaning of § 27-606(2). As such, the court did not err in ruling it was inadmissible in support of Allen's motion for a new trial based on juror misconduct. Allen does not challenge the court's rulings pertaining to the admission of exhibit 301 for the limited purpose of foundation for the information contained in exhibit 300. There being no other evidence that was presented at the evidentiary hearing on Allen's motion for a new trial, the allegations of misconduct were completely unsupported by admissible evidence.

We disagree with Allen's contention that the court erred by not recalling the jurors to be questioned. Not only did defense counsel make no request for the court to do so, but the lack of admissible evidence tending to prove that serious misconduct occurred ended the court's obligations respecting the motion.[54] The court did not abuse its discretion in denying Allen's motion for a new trial.

### 3. Ineffective Assistance

[24] Lastly, we address Allen's claims of ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[55] the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[56]

[25,26] To show that counsel's performance was deficient, the defendant must show counsel's performance did

---

[54] See *State v. Stricklin, supra* note 14.

[55] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[56] See *State v. Miranda, supra* note 5.

not equal that of a lawyer with ordinary training and skill in criminal law.[57] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[58]

In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[59]

### (a) Cause of Death

Allen first argues that trial counsel was ineffective by failing to object "on lack of personal knowledge (foundation), chain of custody, and hearsay"[60] grounds to photographs from the autopsy and to Linde's expert testimony on Torres' cause of death. Allen takes issue with the fact that Linde neither performed the autopsy nor took the autopsy photographs, stating that "[t]he usual way that the prosecution proves the cause of death in a homicide case is by and through testimony of a forensic pathologist who conducted a forensic autopsy on the body of the alleged victim."[61]

Allen also describes the autopsy as having been "botched,"[62] apparently in reference to the wounds Okoye failed to notice on Torres' posterior, but he does not explain how these deficiencies in the autopsy affected the admissibility of the autopsy photographs of the other parts of Torres' body or

---

[57] *Id.*

[58] See *id.*

[59] *Id.*

[60] Brief for appellant at 11.

[61] *Id.*

[62] *Id.*

the admissibility of Linde's expert testimony. Allen makes no argument that the autopsy photographs, which he asserts counsel should have objected to for lack of foundation, were independently prejudicial, but instead suggests that if trial counsel would have objected to the autopsy photographs, such objections would have been sustained and Linde's testimony would have been inadmissible as a result. Allen concludes that defense counsel's failure to object to the autopsy photographs and Linde's testimony "was obviously deficient" and "certainly prejudiced [Allen,]" because the cause of death was critical to making the prosecution's case.[63]

Leaving aside that Torres' cause of death was not in dispute under defense counsel's strategy of arguing the shooting was in self-defense or upon a sudden quarrel, Linde's testimony was not objectionable simply because Okoye did not testify at trial. Neither was the admissibility of Linde's testimony dependent upon the admissibility of the autopsy photographs.

[27-29] A forensic pathologist who did not perform the autopsy may nevertheless provide expert testimony regarding cause of death, and any lack of firsthand knowledge goes to the weight of the opinion rather than its admissibility.[64] Neb. Rev. Stat. § 27-703 (Reissue 2016) provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him [or her] at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

We have explained that § 27-703 contemplates admission of an expert's opinion based on hearsay supplying facts or data for that opinion, rather than requiring firsthand knowledge

---

[63] *Id*. at 13.

[64] See *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002).

as the only source of information for an expert's opinion.[65] Further, an expert may rely on hearsay facts or data that are reasonably relied on by experts in his or her field.[66]

[30] There is no basis for concluding that Linde's opinion as to Torres' cause of death was inadmissible. Allen does not assert that the facts and data Linde described she relied upon were not the kind reasonably relied upon by experts in her field. Counsel is not ineffective for failing to make an objection that has no merit.[67] We find no merit to Allen's assertion that trial counsel was ineffective for failing to object to Linde's testimony as to Torres' cause of death.

### (b) Failure to Call Beall

Allen also asserts counsel was ineffective for failing to call Beall to testify at trial. He argues he was prejudiced because Beall would have testified about Torres' prior violent behavior toward her and threats toward Allen. Furthermore, he generally points out that Beall saw and heard the exchange leading to Torres' death and asserts that "Erickson was a poor substitute for . . . Beall, as his memory was good for things that helped the State and bad for things that helped the defense."[68] Allen asserts that failing to call Beall "as a witness for the defense to confirm and corroborate the evidence for [his] self-defense claim was clearly a deficient act on the part of trial counsel and very clearly prejudicial to [his] defense."[69]

We agree with the State that an evaluation of trial counsel's actions would require an evaluation of trial strategy and of matters not contained in the record. The record is insufficient to review this claim of ineffective assistance of counsel in this direct appeal.

---

[65] *Id*.

[66] *Id*.

[67] *State v. Tyler*, 301 Neb. 365, 918 N.W.2d 306 (2018).

[68] Brief for appellant at 12.

[69] *Id*. at 13.

## VI. CONCLUSION

Finding no merit to Allen's claims of insufficiency of the evidence and jury misconduct, and finding that his claims of ineffective assistance of trial counsel either lack merit or cannot be addressed on direct appeal, we affirm the judgment below.

Affirmed.